Joe Neal WOMACK, Plaintiff,

v.

SHELL CHEMICAL COMPANY, a division of Shell Oil Company, Defendant.

Civ. A. No. 80–06–50H.

United States District Court,
S. D. Alabama, S. D.

May 18, 1981.

**1064**

James D. Wilson, Prichard, Ala., for plaintiff.

Willis C. Darby, Jr., Mobile, Ala., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING SUMMARY JUDGMENT

HAND, District Judge.

This cause is before the court on the motion for summary judgment filed by defendant Shell Chemical Company, a division of Shell Oil Company (Shell). Shell seeks summary judgment on each claim asserted by plaintiff Joe Neal Womack (Womack) on the ground that there is no genuine issue as to any material fact and that Shell is entitled to judgment as a matter of law.

Womack initially brought this action against Shell under the fourteenth amendment to the United States Constitution, 42 U.S.C. § 1981 and Title VII of the *Civil Rights Act of 1964*, as amended, 42 U.S.C. § 2000e *et seq.* Womack alleged:

> [Womack] was not promoted by [Shell] because [Womack] is black and for no other valid reason.

> Donna Lowery [a white female accountant] was promoted over [Womack] because [Womack] is black and for no other reason.

(Complaint ¶ 13, ¶ 15).

> [Womack] was [in February 1980] denied the training [on Shell's Product Cost Information System that had been given to his white predecessor, Donna Lowery.

This training has been denied [Womack] because he is black and for no other reason.

(Complaint ¶ 18 and ¶ 19).

> The rating system used by [Shell] to grade its professional staff, specifically its accounting staff, *is applied* to those employees desiring a promotion in such an arbitrary and capricious manner by [Shell] ... so as to amount to no rating system at all, but merely *a device* to promote some employees and deny promotion to others not based on actual job performance.

(Complaint ¶ 22 (emphasis supplied).

Shell answered the complaint and asserted defenses under Rule 12(b), *Federal Rules of Civil Procedure.* On December 23, 1980, this court *dismissed* (a) all claims under the fourteenth amendment for failure to state a claim upon which relief can be granted, and (b) the promotion claim under 42 U.S.C. § 1981, as barred by the statute of limitations.[1] The court retained for adjudication (a) the promotion claim under Title VII and (b) the Product Cost Information System (PCIS) training claim under both Title VII and 42 U.S.C. § 1981. The court has not previously addressed Womack's allegation that the rating system utilized by Shell to grade professional accounting staff is "arbitrary and capricious" and "is applied" as "a device" to deny promotion to "some employees." Although Womack did not allege that the rating system is applied as a device to deny promotion *on the basis of race*, the court has liberally construed the allegation within the context of Womack's other claims of race discrimination and has fully considered the claim herein.

Shell seeks summary judgment on the following grounds:

(1) This court lacks subject matter jurisdiction[2] over Womack's Title VII claims

---

1. The court granted Womack ten days to amend the complaint and allege facts that the § 1981 promotion claim was a "continuing violation" and was therefore timely filed. Womack did not amend the complaint.

2. *See* Conclusions of Law ¶ 12 (noting that proper disposition is not dismissal for lack of subject matter jurisdiction but, instead, dismissal for failure to act timely).

(promotion and PCIS) because Womack failed to file a timely charge of discrimination with the Equal Employment Opportunity Commission (EEOC) in connection with the *only* claimed act of racial discrimination—a poor performance rating given Womack in March 1977;

(2) Womack has failed to adduce facts to establish a *prima facie* case of racial discrimination under either Title VII or § 1981 in connection with his failure to achieve promotion, his delay in receiving training on the Product Cost Information System, or the application of Shell's rating system; and,

(3) Regardless whether Womack could establish a *prima facie* case, Shell has adduced undisputed facts articulating legitimate, nondiscriminatory reasons for the promotion and PCIS decisions and Womack has filed to adduce facts to establish that the proffered reasons are a pretext for racial discrimination.

■ The court is cognizant that summary judgment is "especially questionable" in employment discrimination cases, because such cases necessarily involve examining motive and intent. Summary judgment should be used cautiously in such cases and all procedural requirements must be given strict adherence. *See Bullard v. OMI Georgia, Inc.*, 640 F.2d 632, 633–34 (5th Cir. 1981); *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 997 (5th Cir. 1979).[3] The Fifth Circuit has particularly cautioned against summary disposition "on a potentially inadequate factual presentation." *Hayden v. First National Bank of*

*Mt. Pleasant*, 595 F.2d 994, 997 (5th Cir. 1979). *See also,* 6 *Moore's Federal Practice* ¶ 56.15[7] (2d ed. 1980).

In considering the motion for summary judgment, this court may not adjudicate factual issues. This court's duty is to determine whether or not there is an issue of fact to be tried. Shell has the burden of *clearly* establishing that there is no genuine issue of material fact; any doubt as to the existence of a genuine issue of material fact must be resolved against Shell. In reviewing the *entire* record, this court has viewed the facts together with all underlying inferences drawn from the facts in the light most favorable to Womack. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–97 (5th Cir. 1979); *Bullard v. OMI Georgia, Inc.*, 640 F.2d 632, 633–34 (5th Cir. 1981); 6 *Moore's Federal Practice* ¶ 56.15 (2d ed. 1976).

■ Furthermore, in considering a motion for summary judgment in an employment discrimination case such as this, the court must fully heed the admonition of the Supreme Court in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977):

> [D]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.

---

**3.** The record in this action is complete and adequate. On deposition, Womack testified that Shell's Employee Relations Manager (McGrath), former Mobile Plant Controllers (Jacobs and Dastugue), Financial Representative (Brown), former Financial Representative (Moran) and other non-supervisory employees had knowledge of relevant facts (Womack at 234–43). The depositions of Womack, Jacobs and McGrath, as well as the affidavits of Womack, McGrath, Brown and Dastugue, have been filed with the court. Moran is no longer employed by Shell. Additionally, several hundred pages of documentary exhibits have been filed; Womack does not dispute the admissibility of

such records. Under Local Rule 8 of this court, Womack had 30 days to respond to the motion for summary judgment. Except for his own affidavit, Womack did not file additional factual matter. Womack did file a response to summary judgment (hereafter referred to as "Womack Response") as required by Local Rule 8.

Deposition testimony is cited by deponent's last name and by the deposition page number. All deposition and affidavit exhibits have been numbered consecutively without designation as plaintiff's or defendant's exhibits and are cited "Exhibit _____ at _____". Affidavit testimony is cited: "(name) Affidavit ¶ _____."

Cognizant of the sensitive nature of Womack's claims, this court has strictly adhered to all the procedural requirements of summary judgment. The court may not, however, ignore the clear dictates of Rule 56, *Federal Rules of Civil Procedure*. No civil action is "immune" from summary adjudication. *See* 6 *Moore's Federal Practice* ¶ 56.15[8] at 56–641 (2d ed. 1980); *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968) (on summary judgment, defendant successfully demonstrated that the facts were not susceptible of the "interpretation" plaintiff advanced). Even in employment discrimination cases, summary judgment will be granted, if appropriate. *See e. g., Gatling v. Atlantic Richfield Co.,* 577 F.2d 185 (2d Cir. 1978), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 169 (1978); *Sagers v. Yellow Freight System, Inc.,* 529 F.2d 721, 728 n.13 (5th Cir. 1976) ("the fact that the [party opposing summary judgment] vigorously disputed the legal conclusions to be drawn from the facts presented by the [movant] was no bar to the grant of summary judgment"); *Anderson v. Viking Pump Div., Houdaille Industries,* 545 F.2d 1127 (8th Cir. 1976).

Shell is entitled to summary judgment "if *everything* in the record ... demonstrates that no genuine issue of material fact exists" and if Shell is entitled to a judgment as a matter of law. *Bullard v. OMI Georgia, Inc.,* 640 F.2d 632, 633–34 (5th Cir. 1981). Although Shell must clearly establish the absence of a genuine issue of material fact, *see Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), when confronted with a properly supported motion for summary judgment, Womack "must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), *Federal Rules of Civil Procedure.*

The Fifth Circuit long ago made clear that this court may not avoid its judicial obligation when presented a properly supported motion for summary judgment:

Litigants have no difficulty finding expressions urging courts to have a due regard for a cautious observance of the requirements of a summary judgment or, if they are appellees, they may find expressions that summary judgments are looked upon with favor. Barron & Holtzoff, however, make the pertinent observation: "Cases voicing such sentiments as that courts should be slow to grant summary judgment and that any error should be on the side of caution should be limited to their facts. [Rule 56] itself provides that 'the judgment sought shall be rendered forthwith if * * * there is no genuine issue as to any material fact and * * the moving party is entitled to a judgment as a matter of law.'" 3 Barron & Holtzoff, *Federal Practice and Procedure,* § 1231.

*Bruce v. Travelers Insurance Co.,* 266 F.2d 781, 786–87 (5th Cir. 1959).

The court has fully considered the pleadings, depositions and exhibits on file, the affidavits filed in connection with the motion for summary judgment, and the briefs and [oral argument] of counsel for the respective parties, including the Womack Response to summary judgment. The court concludes that there is no genuine issue as to any material fact and that based upon the following Findings of Fact and Conclusions of Law, Shell is entitled to judgment as a matter of law.

## FINDINGS OF FACT

1. Shell operates a chemical plant in Mobile County, Alabama (Mobile Plant). At all pertinent times, Shell employed more than 15 employees at the Mobile Plant. Womack, a black male, resides in Mobile, Alabama, and has been continuously employed at the Mobile Plant since November 1973 (Womack at 5).

2. Womack alleged that he was not promoted from "Grade 5 Accountant" to "Grade 6 Financial Accountant" because he is black and for no other valid reason (Complaint ¶ 13). On deposition, Womack testified that his claim against Shell "basically comes from the job that I felt that I was

qualified for and didn't get" (Womack at 138). Based upon an exhaustive review of the record, however, the undisputed facts establish that Womack's claim, if any, arose in 1977, and that his performance appraisals in 1977 and subsequent failure to achieve promotion in 1979 were based upon his job performance.

3. The decision to promote Donna Lowery (effective March 1, 1979) was made by then Mobile Plant Controller Marcel Dastugue (Dastugue Affidavit ¶ 7; Womack at 63–64, 220). On deposition, Womack implicitly admitted that Dastugue's 1979 promotion decision was not racially motivated; Womack testified that Dastugue reviewed Womack's employment record and based the promotion decision on Womack's record of performance (Womack at 64–67, 220):

Shell basically has a rating system rating [employees] from one ... [the top] to five ... [the worst]. [U]p to 1977 my rating had always been a three. I understood from Shell's system that three's and above [one and two] are promotable. At one particular time [1977] my rating dropped from a three to a five and I imagine that was probably the reason [for Dastugue's promotion decision].

(Womack at 65).

Q. [Dastugue] was looking at your record of performance at Shell ... and he based his opinion, in your opinion, on what your [Womack's] record of performance was?

A. In my opinion; yes, right.

(Womack at 67). In substance, Womack's promotion claim is that in 1977 his supervisor, A. C. Jacobs (Dastugue's predecessor as Mobile Plant Controller), was either unable or unwilling to communicate effectively with Womack, a black man, and that the communication failure precipitated disagreements on two work projects. Womack contends that the disagreements, in turn, resulted in an adverse performance apprais-

al and rating by Jacobs in March–August 1977, which subsequently formed a basis of Datugue's promotion decision in 1979 (Womack at 76–85, 94–95, 100–101, 112–114, 124–126).

4. Womack did not testify that his 1977 performance appraisals were *per se* discriminatory. Rather, Womack testified:

I believe that [Jacobs'] inability to communicate with me dealt with the fact that I do have an opinion and I am very emphatic on that opinion at times, and because I am very—I am a black person with a very emphatic opinion, I believe that did have an effect on a lot of his actions towards me.

(Womack at 83–84).

Q. Was [Jacobs] not fair because you were black?

A. This communication problem ... was because I was black and his inability to deal with the fact that I was black.

\* \* \* \* \* \*

[The failure of communication] may have just been inability.

(Womack at 121, 123).[4]

5. Although Womack's testimony establishes that the only alleged discriminatory act occurred in 1977 (Womack's EEOC charge was filed effective in June 1979), the court has conducted an exhaustive review of the undisputed facts in connection with Womack's job performance, his failure to achieve promotion in 1979, his delay in receiving training on PCIS, and the performance appraisal and rating system at the Mobile Plant, in order to determine if Womack has been the victim of discrimination.

6. Womack graduated from Mobile County Training School (high school), and in 1972 he received a bachelor of science degree in general business from St. Paul's College in Lawrenceville, Virginia (Womack

---

**4.** Jacobs left the Mobile Plant and was replaced by Dastugue in August 1978 (Womack at 111, 98). Womack admitted that he never advised anyone at Shell that Jacobs purportedly discriminated against him because of his race (Womack at 97). Womack further testified that he and Jacobs were the only professionals in the Financial Department at the Mobile Plant in March 1977 and that Jacobs communicated just as well with black clericals in the Financial Department as he did with white clericals (Womack at 104).

at 6). Although Shell employed Womack in November 1973, Shell did not obtain a copy of Womack's college transcript until October 1976 (McGrath at 43–44; Jacobs at 130–131; Exhibit 20).

7. After graduation from St. Paul's College, Womack was employed by Metropolitan Life Insurance Company as a salesman for approximately six months. Womack subsequently enlisted in the Marine Corps, reached the rank of platoon commander and received an honorable discharge in November 1973. After discharge from active duty, Womack remained in the Marine Corps Reserve and participated in Reserve training on Saturdays (Womack at 6, 222).

8. Shell employed Womack in the Financial Department as an Accountant Grade 5 (an entry level position) in November 1973 (Womack at 12). At that time, Womack's immediate supervisor[5] was Robert G. Brown (Brown), the Financial Representative at the Mobile Plant; Brown had been employed by Shell in various accounting and supervisory positions since June 1954 and had been assigned to the Mobile Plant since July 1968 (Brown Affidavit ¶ 2; Womack at 17).

9. Upon his employment, Shell furnished Womack "A Handbook for Employees of the Mobile Plant" (Employee Handbook) and a pamphlet entitled "What Shell Means to You" (Shell Pamphlet) (McGrath Affidavit ¶¶ 8–9); Exhibit 39; Womack at 11). The Employee Handbook clearly states Shell's equal opportunity policy and describes the "Educational Reimbursement" program that is available to provide financial assistance to employees who wish to participate in job-related educational programs (Exhibit 38 at 14–16). The Employee Handbook further details an employee complaint procedure whereby an employee may pursue any complaint (including a complaint in connection with a performance appraisal) to (1) his supervisor, (2) the department manager, (3) a grievance committee which consists of one supervisor, the

Mobile Plant Employee Relations Manager and two employees chosen by the complainant), and, ultimately, (4) the Mobile Plant Manager (Exhibit 38 at 17–18).

10. The Employee Handbook makes clear that job opportunities are dependent upon employee initiative:

### PERSONAL DEVELOPMENT

Development in its broadest sense means growth. Everyone is interested in growing in his job and, to do so effectively, each employee should plan and carry out his own personal program of self-development. The goals of such a program should be to increase his effectiveness on his present assignments, and to prepare for growth into assignments of greater responsibility.

(Exhibit 38 at 18–19). The Shell Pamphlet restates the equal opportunity and educational reimbursement policies and summarizes the employee complaint procedure (Exhibit 39 at 5–9).

11. Shell also posts its equal opportunity policy on employee bulletin boards in the Mobile Plant. The policy advises Shell employees that discrimination complaints may be communicated *directly* to Shell's Equal Opportunity Officer (Employee Relations Manager Frank McGrath) (Womack at 8–9; McGrath Affidavit ¶ 10).

12. On deposition, Womack testified that he received a copy of the Employee Handbook. Although Womack did not read the entire handbook, he admitted that he was aware he could communicate employment complaints to his supervisor and that he communicated such a complaint directly to Employee Relations Manager Frank McGrath in connection with his performance Appraisal Report in March 1977. Womack did not, however, inform McGrath that he considered the performance appraisal racially biased (Womack at 8–12). *See* Finding of Fact ¶ 81 *infra*.

---

**5.** Both the Financial Representative in the Financial Department and the Mobile Plant Controller (a position established in 1975) had supervisory authority over Womack (Womack at 17).

13. On deposition, Womack described his job as an accountant in the Financial Department at the Mobile Plant:

> [I] basically handle the capital side of the business. I did the capital reporting. I got involved in month-end accounting, which we call closeout. I got involved in that. I did year-end reporting, and most of the reports that went out of the financial office concerning year-end reporting and relating to capital, I did, and some other reports. I did some auditing and some inventory accounting. That is basically it.
>
> *   *   *   *   *   *
>
> [In] the financial office—everything is very repetitive. You do a lot of work that repeats itself.

(Womack at 12, 15).

14. Womack was given general salary increases in May and July 1974 (Exhibit 40). In August 1974, Financial Representative Brown (Womack's immediate supervisor) transferred from the Mobile Plant to Houston. At that time, A. C. Jacobs (Jacobs) transferred from Shell's agricultural Division office in California to the Mobile Plant and replaced Brown as both Financial Representative and Womack's immediate supervisor (Womack at 17–19; Jacobs at 5–7; Brown Affidavit ¶ 2, ¶ 10).

15. When Jacobs became Financial Representative in August 1974, the following personnel were in the Financial Department at the Mobile Plant:

| | |
|---|---|
| A. C. Jacobs | Financial Representative (white male) |
| J. N. Womack | Accountant (black male) |
| H. S. Rhodes | Clerical (white female) |
| Frances Carrigan | Clerical (white female) |

(Brown Affidavit ¶ 6; McGrath Affidavit ¶ 11).

16. Shortly after Jacobs assumed the position of Financial Representative at the Mobile Plant, Womack advised Jacobs that he (Womack) was continuing his job-related education at the University of South Alabama (Jacobs at 220–21; Exhibit 2 at 4).[6]

17. In August 1974, Shell announced its BLADEX expansion at the Mobile Plant. The BLADEX project would ultimately increase the assets of the Mobile Plant from approximately $15 million to $140 million and employment at the Mobile Plant from approximately 72 to 300 employees. The BLADEX project also caused an increase in the volume and complexity of accounting data at the Mobile Plant (Jacobs at 209–10; McGrath Affidavit ¶ 13). In May 1976, construction actually commenced on the BLADEX project and E. F. Moran (Financial Representative) transferred to the Mobile Plant to maintain the BLADEX project work in progress financial records. Moran performed substantially all of his work at the construction site (McGrath Affidavit ¶ 13).[7]

18. On December 1, 1974, Womack was given a general salary increase (Exhibit 40); the salary increase reflected the cost of living increase given Mobile Plant personnel on that date (McGrath Affidavit ¶ 14).

19. Shell conducts an annual performance appraisal of each professional employee at the Mobile Plant; a written performance Appraisal Report is prepared (McGrath at 20–21; Exhibit 16). The Mobile Plant Performance Appraisal Program (Exhibit 16) is designed to evaluate an employee's performance in comparison with the performance of other Shell employees doing similar work. The program also provides the employee with feedback regarding his job performance, his performance strengths and weaknesses and necessary performance improvements; the program thus enables

---

6. Womack did receive a certificate from the University of South Alabama in March 1974 certifying that he "ha[d] completed a course in Accounting II." Upon successful completion of the job-related course, Womack was reimbursed 100 percent of his out-of-pocket costs (excluding books) under Shell's educational reimbursement program (Exhibit 37; McGrath Affidavit ¶ 12). The basic accounting certificate was the only indication Shell received that Womack was continuing his education.

7. Moran transferred to Head Office in Houston in June 1978 and resigned his position with Shell in 1980 (McGrath Affidavit ¶ 13).

management to assist the employee to improve his future performance. The Performance Appraisal Program further affords management necessary information for immediate employment decisions, such as termination, transfer and promotion, as well as for long-term career decisions. The Performance Appraisal Program affords direct employee input as well as supervisor input. The employee prepares a Personal Review Worksheet which contains specific work-related questions to be answered by the employee (Exhibit 17 at 17–18) and the supervisor prepares a performance Appraisal Report. The supervisor must describe the employee's duties and must answer specific questions about the employee and the employee's performance in specified areas. In completing the Appraisal Report, the appraiser must apply defined criteria (Exhibit 17, "Supervisor's Guide to Employee Performance Assessment and Development"). Following completion of the performance Appraisal Report by the supervisor and the Personal Review Worksheet by the employee, the supervisor conducts a "performance discussion" with the employee. During the performance discussion the employee is given an opportunity to review the Appraisal Report and to discuss fully his work, the results achieved and his performance shortcomings. After completing the Performance Appraisal Program, the employee is assigned a Summary Rating Code (Exhibit 17 at 7; Exhibit 15). The Summary Rating Code rates each employee's performance on a "1" to "5" scale:

1 Performance *substantially exceeds* normal expectations. (10% of staff rated)

2 Performance *exceeds* normal expectations. (25% of staff rated)

3 Performance *meets* normal expectations.

4 Performance is generally acceptable relative to normal expectations, but does not fully meet all expectations. (15% of staff rating—including those rated "5" as defined below)

5 Performance is *significantly* below normal expectations. (Although there is no separate distribution for this rating, it should be used realistically) (Exhibit 15 at 3; McGrath at 19–20). Following completion of the Appraisal Report and performance discussion, the report is reviewed for consistency by the Mobile Plant Employee Relations Manager and ultimately by the Mobile Plant Manager (Exhibit 16 at 3; McGrath at 13–25).

20. When Employee Relations Manager Frank McGrath assumed his position in 1976, the Performance Appraisal Program at the Mobile Plant was being operated in a competent manner and in accordance with Shell standards (McGrath at 11). On deposition, McGrath emphasized that the program is designed to ensure both employee input and performance appraisal:

> Shell puts great significance on the fact that the supervisor has to commit his opinions to writing and state those opinions to the employee.... [T]he expectation is that the employee will communicate—the employee and the supervisor together will communicate together over that data.

(McGrath at 24).

> [The Appraisal Report] is double-checked by the employee. It is double-checked by [Employee Relations Manager] and it's double-checked by the Plant Manager, so, there are basically three levels of control over the supervisor.

(McGrath at 25). McGrath further testified that his review of each Appraisal Report is part of the audit and review function that ensures consistency throughout the Mobile Plant. For example, if an Appraisal Report and Summary Rating vary significantly from a prior appraisal, McGrath determines whether the subsequent appraisal is a true reflection of the employee's performance (McGrath at 14–16). McGrath reviews specific work product (objective data) to substantiate any subjective elements of the Appraisal Report (McGrath at 16, 57).

21. Although Womack alleged that the Performance Appraisal Program ("rating system") is arbitrarily and capriciously applied as a device to promote some employees and deny promotions to others, Womack

frankly admitted that he had no facts to support that contention. Womack did testify that in *his case* the rating system was arbitrary and "did not indicate [his] job ability or performance," but he disputed only one (March 1977) of several performance Appraisal Reports. In lieu of factual support, Womack proffered that he would support his allegations by the testimony of persons with knowledge of the operation of Shell's Performance Appraisal program; Womack specifically identified Employee Relations Manager McGrath, former Mobile Plant Controller Jacobs, Financial Representative Brown, former Mobile Plant Controller Dastugue, former Financial Representative Moran (no longer employed) and other non-supervisory employees (Womack at 234–43). The depositions of Jacobs and McGrath and the affidavits of Brown and Dastugue do not support Womack's allegations, however, and Womack has not adduced factual support by affidavit or otherwise (Dastugue Affidavit ¶ 8 and ¶ 9; Brown Affidavit ¶ 4). On the contrary, the undisputed facts demonstrate that Shell's Performance Appraisal program at the Mobile Plant is based on employee performance and that employee's are afforded detailed safeguards to ensure appraisal consistency.

22. The Appraisal Report form contains major topic headings followed by the printed criteria the appraiser *must* consider when conducting the evaluation. The printed portions of the form are followed by blank spaces for the appraiser's comments.[8] Jacobs prepared Womack's initial performance Appraisal Report in January 1975 (Jacobs at 10; Exhibit 2). Womack's January 1975 performance appraisal was based, in part, upon Jacobs' conversations with Brown (Womack's immediate supervisor until August 1974). Jacobs called Brown in Houston and Brown advised Jacobs that Womack was an average performer based upon his (Womack's) limited experience with Shell. The initial Appraisal Report described Womack's work assignment and

evaluated his job performance during the previous year (Jacobs at 17–18; Brown Affidavit ¶¶ 11–12):

## JOB PERFORMANCE

*WORK ASSIGNMENT. Specifically, what results were expected?*

Mr. Womack is responsible for a number of accounting related functions: Capital Asset Reporting and Record Control, auditing of disbursements, bank account reconciliation, custodian of Petty Cash Fund, various month-end journals and closing reports, and some internal auditing. He is also expected to assume the responsibility for supervision of Financial activities in the absence of the Financial Representative. He was expected to learn the processing mechanics of his areas of responsibilities as well as develop a clear understanding of the reasoning behind the various operations he performed. *RESULTS PRODUCED. What was produced? How did it relate to objectives?*

Mr. Womack has obtained a reasonably good understanding of the mechanics of his responsibilities, but has not as yet completely grasped the reasons for or the purpose of the various functions he performs. Mr. Womack also has not demonstrated the level of problem solving skills that we feel is necessary for him to do his job effectively. In summary, Mr. Womack has a good understanding of the routine mechanics of his areas of responsibility, but has not shown the level of professional job understanding that we had expected him to. Since this is Mr. Womack's first review, we have discounted his lack of growth in problem solving skills and feel that this area will improve with dedicated effort on his part.

## PERFORMANCE FACTORS

*JOB KNOWLEDGE. Consider demonstrated understanding of the job assignment and the knowledge required to ac-*

---

8. The underscored portions of the form herein indicate the printed portion of the form. The appraiser's comments are not understood.

complish it. *Are duties, responsibilities, and authority understood?*

Mr. Womack has a good understanding of the mechanics of his job but does not clearly understand the logic behind the procedures.

*PROFESSIONAL KNOWLEDGE. Consider both the depth and breadth of professional knowledge. How well is it applied on the job?*

He has had limited technical training in Accounting. He needs to improve his professional knowledge of Accounting and Finance.

*PROBLEM SOLVING. Consider ability to identify, analyze, and solve problems. Consider the soundness of decisions as reflected in work done.*

Needs to improve in this area; has some difficulty in identifying and solving problems.

*PLANNING AND ORGANIZING. Consider how well work is planned and organized for maximum efficiency.*

Average skills in this area; needs to improve the organization of his work.

*INTERPERSONAL RELATIONS. Consider effectiveness in dealing with others. Are normal face-to-face contacts handled without antagonizing or alienating others?*

Extremely personable individual; gets along well with others.

*WRITTEN EXPRESSION. Consider written reports, letters, and memoranda. Are they clear, explicit, and well organized? Were thoughts expressed logically and accurately? Are communications effective and efficient?*

Has had limited occasion to demonstrate his skill in this area. Has a tendency to avoid this method of communication.

*ORAL EXPRESSION. Consider oral presentations. Are they effective? Are speech and diction good? Is expression clear, logical, and convincing?*

Average—needs to work on developing more effective ways of getting his point across.

*SELF DEVELOPMENT. Consider reactions to suggestions concerning personal development. What has been accomplished toward the development goals established in the last Performance Discussion? If goals have not been achieved, indicate why.*

Mr. Womack is very receptive to constructive criticism and reacts favorably when suggestions for improvement are made.

## APPRAISAL SUMMARY

*Summarize greatest strengths.*

Mr. Womack's greatest strengths lie in his positive attitude towards his job and his willingness and desire to learn new responsibilities. An additionally strong attribute of Mr. Womack's is his affable personality and ability to get along with others.

*Summarize principal job areas where improvement is needed.*

(1) Improve problem solving skills

(2) Attempt to do more written communication to improve skills

(3) Improve professional and technical knowledge of Accounting and Finance.

*If you were filling a position in employee's area of specialty, would you:*

[ ] Prefer over others   [ ] Rather not have
[X] Willingly accept    [ ] Definitely not want

*If employee has three years or less Shell service, or is considered an inadequate performer, should employment be continued?*

Yes. Given adequate time to learn, I'm sure Mr. Womack will develop the skills necessary to make a positive contribution.

(Exhibit 2 at 3).

23. After Jacobs prepared the performance Appraisal Report, he gave the report to Womack for review and subsequently conducted a "performance discussion" with Womack (Womack at 123–25, 181–82).[9]

---

**9.** Womack testified that he was afforded the opportunity to review and discuss *each* Ap-praisal Report prepared by Jacobs (Womack at 133–34).

Following the performance discussion, Jacobs completed the Appraisal Report:

### PERFORMANCE DISCUSSION

*Significant items discussed of importance to management*:

Mr. Womack was concerned with the professional content of his job. It was agreed that many functions that he currently performed were clerically oriented. He was told that in the near future an attempt would be made to redistribute work to relieve him of the redundant clerical work.

*What are stated career objectives*?

Would like to be given opportunity to supervise and direct people.

### CAREER PLANNING

*DEVELOPMENT PLANS RECOMMENDED (e. g., special assignments, management or professional study courses, and training activities).*

Mr. Womack is currently working on his MBA. Would suggest sending him to Houston for a training session. This would give him some exposure to other entry level people and give him perspective on the competition for jobs.

Under the heading "Career Planning," Jacobs noted that promotion for Womack "would depend on a significant improvement in Mr. Womack's problem-solving skills" (Exhibit 2 at 4).

24. In early May 1975, Jacobs informed Womack that Womack would receive a salary increase effective May 1, 1975. Jacobs' conference notes reflect:

Mr. Womack was quite pleased with the increase and said he felt Shell had been more than fair with him during his first year and one-half with the company. [Womack] said he was looking forward to the expansion [Bladex project at Mobile Plant] and felt this was a tremendous opportunity for him to learn and develope his financial skills.

(Exhibit 41).

25. On July 1, 1975, Jacobs promoted Georgia Landrum, a black typist in the Employee Relations and Services Department, to the position of Financial Assistant in the Financial Department (Jacobs at 210; McGrath Affidavit ¶ 16).

26. In August 1975, T. L. Stark (Stark) transferred to the Financial Department in the Mobile Plant from Shell's Wood River Refinery in Illinois where Stark had been employed as an accountant. Stark assumed a position as Senior Accountant responsible for all cost accounting. In November 1975, Financial Representative Jacobs was promoted and became Mobile Plant Controller. In Early 1976, Stark became supervisor of the accounting area; in that position Stark was Womack's immediate supervisor (Jacobs at 29–30; Womack Response at 4). Stark was not responsible, however, for the internal auditing program, forecasting or the Bladex construction project (Jacobs at 29–30). Although Jacobs was Plant Controller, he continued to have significant day-to-day contact with Womack (Jacobs at 30–31).

27. In late January 1976, Womack prepared a Personal Review Worksheet in connection with his forthcoming second performance appraisal. In accordance with Shell appraisal procedure, Womack was thereby afforded detailed input into the performance appraisal/discussion process (McGrath at 12; Exhibit 17).

### PERSONAL REVIEW SHEET

Q. *Describe your job: What are your duties and responsibilities*?

A. Although I have other related jobs, 85% of what I do deals with capital information. I have also done more auditing.

Q. *What specified job related goals have you met during the past review period*?

A. I have tried to become more of Mobile in-house capital expert. I have also tried to get more involved in the cost accounting side of the house. I have also become more involved in auditing.

Q. *What part of your job interests you most*?

A. Gathering the figures and allocating the dollars on the monthly closing wires. Working with the engineers on closed capital projects and keeping them straight on open projects.

Q. *What part of your job interests you least?*

A. [No reply]

Q. *Are there changes you would like to see made in your job content or the organization of your work group which would help you to be more efficient?*

A. Need more cooperation from the engineers to accomplish my job more effectively, especially when it comes to determining the capital assets.

(Exhibit 42).

28. On February 10, 1976, Jacobs prepared a performance Appraisal Report regarding Womack's performance between December 1974 and December 1975:[10]

### JOB PERFORMANCE

*WORK ASSIGNMENT.*

Mr. Womack is primarily responsible for Capital accounting, i. e., controlling AFE's/[Authority for Expenditure] Capital reporting, both monthly and annual, maintaining detailed asset ledgers and equipment listings. In addition, he is responsible for some month-end closing journals and reports, special projects and some internal audits.

*RESULTS PRODUCED.*

As a result of Mr. Womack's last review, his job was restructured to minimize the clerical aspects of the assignment and expand the professional areas. He has continued to do an adequate job on capital asset control and month-end closing. In his January 1975 review we discussed his ability to more effectively organize his work and his problem solving skills. These two areas continue to be a problem as Joe has not made the progress we expected. However, it should be noted that the current standard by which Mr. Womack has been measured is higher than the previous review due to the fact that we have increased the professional content of his work. Additionally, we would expect an individual who has been on the capital desk for two years to become the in-plant capital expert. Mr. Womack has not as yet obtained this level of job knowledge. Mr. Womack needs to improve his aggressiveness towards his assignments. He has shown some improvement in the results produced when given an auditing assignment.

### PERFORMANCE FACTORS

*JOB KNOWLEDGE.*

Average understanding of assignment, but sometimes he may not clearly understand the proceeds without obtaining clarification.

*PROFESSIONAL KNOWLEDGE.*

He has not assimilated a professional level of understanding of Shell's Capital policies and procedures that he should have. Has been handling Capital for two years now.

*PROBLEM SOLVING.*

Joe is slower to recognize problems and/or solutions that we expect for a person with his experience.

*PLANNING AND ORGANIZING.*

Needs improvement in this area.

*INTERPERSONAL RELATIONS.*

Good. Mr. Womack gets along well with others, but needs to improve his confidence level when dealing with Managers.

*WRITTEN EXPRESSION.*

Needs to improve the organization of his thoughts. Also needs to use this method of communication more.

10. The second Appraisal Report incorrectly states that the period covered was from 12/75 to 12/76; the correct period was 12/74 to 12/75 (Jacobs at 31). Only the major topic headings are set forth for the February 1976 Appraisal Report. The same form is utilized for each performance Appraisal Report. The form *criteria* the appraiser *must* consider under each major topic heading are set forth in Womack's January 1975 Appraisal Form. *See* Findings of Fact ¶¶ 22–23, *supra.*

*ORAL EXPRESSION.*

Average. Needs to be more confident in expressing his thoughts on a subject.

*SELF DEVELOPMENT.*

Takes constructive criticism well, but has not executed a plan to improve organization skills and/or problem solving skills.

## APPRAISAL SUMMARY

*Summarize greatest strengths.*

Excellent attitude. Wants to learn more about his assignment and improve his performance. Gets along well with fellow-workers.

*Summarize principal job areas where improvement is needed.*

Needs to improve: (1) oral and written communications; (2) become more organized in his approach to his job; (3) needs to work very hard on improving problem solving abilities; (4) become more assertive.

*If you were filling a position in employee's area of specialty, would you:*

[ ] Prefer over others    [ ] Rather not have
[X] Willingly accept    [ ] Definitely not want

*If employee has three years or less Shell service, or is considered an adequate performer, should employment be continued?*

Yes. Individual needs to show definite improvement in those areas where he is weak.

After completing the performance appraisal, Jacobs submitted the report to Womack for review, and conducted a performance discussion with Womack (Womack at 133–134, 181–82). Jacobs thereafter completed the form:

## PERFORMANCE DISCUSSION

*Significant items discussed of importance to management:*

Mr. Womack feels that this review does not clearly reflect the type of individual he really is. He said he plans to do what is necessary to exceed his current rating. He could not accept that'a "3" rating was a very acceptable rating under Shell's system. We need to build his confidence.

*What are stated career objectives:*

Mr. Womack wants very much to become a Manager within Shell.

## CAREER PLANNING

*DEVELOPMENT PLANS RECOMMENDED (e. g., special assignments, management or professional study courses, and training activities):*

Mr. Womack should continue his graduate school training. Send him to some Shell sponsored management courses.[11]

(Exhibit 3 at 1–4) In the section entitled "Career Planning," Jacobs also noted that "Mr. Womack's performance would have to improve during next review period to warrant" promotion (Exhibit 3 at 4).

29. Several days after the performance discussion between Jacobs and Womack, Womack advised Jacobs that he (Womack) wanted to discuss his performance appraisal with Mobile Plant Manager E. S. (Pinky) Martin, because he (Womack) was dissatisfied with the performance assessment. Jacobs advised Womack that he (Womack) had every right to discuss the performance appraisal with the Plant Manager and that Jacobs would arrange the meeting. Jacobs was not present during the conference between Womack and the Mobile Plant Manager. Plant Manager Martin subsequently

---

11. Womack has been afforded many training opportunities by Shell. Womack has been sent to various Shell workshops designed to improve technical and professional skills (McGrath Affidavit ¶ 17; Womack at 220–30). In September 1978, Womack attended a Shell Presentations Workshop in Houston for the improvements of communications skills. In March 1979, Womack attended a Shell Capital Expenditures Forecast Workshop. In August 1979, Womack attended a Shell Basic Management Skills Workshop in Houston and has also attended a Shell Auditors Workshop. In August 1980 Womack attended both a training program for the Mark IV Computer System in Houston (Womack at 229), and a Better Business Meeting Workshop in Mobile. Womack received the one-week training on PCIS in Houston commencing on March 23, 1981. Donna Lowery has not received several of the foregoing training courses. (McGrath Affidavit ¶ 17)

advised Jacobs, however, that Martin agreed with Jacobs' performance appraisal and that Martin had so informed Womack (Jacobs at 222).

30. During February 1976, a new Cost Accounting Manual which included a Capital Procedure section was adopted by the Mobile Plant. The Capital Procedure section had revised instructions for the issuance of Capital AFE's (Authority for Expenditure) and other Capital procedures. At that time, Jacobs instructed Womack to implement to new procedures (Exhibit 11 at 39–48).

31. On February 17, 1976, Jacobs issued instructions to "Mobile Plant Department Heads" regarding procedures for improvement of closing work orders. The instructions in pertinent part, directed that the Financial Department prepare a report at the end of each month listing all work orders closed during the month and those work orders that were open at the end of the month (Exhibit 11 at 39). A copy of the instructions was forwarded to Womack. Prior to issuing the instructions, Jacobs discussed the concept of the instructions with the Mobile Plant Engineering Manager, Bob Newell, and with Womack whose job it would be to prepare the monthly summary report detailing all work orders closed during the month; Womack would also be required to make the necessary entries in the Capital accounts (Exhibit 11 at 39–48).

32. On March 25, 1976, Jacobs (Mobile Plant Controller) directed the following memorandum to all professional employees under Jacobs' supervision—Stark (Financial Representative) and Womack (Accountant):

I would like to develop a semi management by objectives approach to doing our business. As part of this exercise, I would like each of you to submit to me a list of your on-the-job objectives for the remainder of 1976. These objectives should be rather specific so that we can relate accomplishment to objectives. Secondly, the objectives should be stretch targets so that you have to really strive to obtain them. Once you submit the objectives, we will review and hopefully come to an agreement as to a set of objectives for each of you.

(Exhibit 11 at 38). Womack did not respond to Jacobs' request (Jacobs at 222–23; Exhibit 11 at 10, 13).

33. On April 30, 1976, Jacobs advised Womack that he would receive a salary increase effective May 1, 1976, and Womack replied he was pleased with the increase. Following the conference, Jacobs noted:

Joe was pleased with the increase and I feel he was satisfied that he was being administered fairly under Shell's salary guidelines. I also explained to him that salary increases both frequency and amount, are and will be a direct reflection of his contribution.

(Exhibit 43).

34. On July 20, 1976, a three-man internal audit team from Shell corporate headquarters in Houston, Texas, (referred to as "Head Office" by Shell personnel) began a detailed audit of the procedures and financial controls used by the Mobile Plant. The audit was the first Head Office audit of the Mobile Plant since 1972 (Exhibit 13 at 3; Jacobs at 224).

35. The internal audit team prepared a detailed "Audit of Mobile Chemical Plant" dated September 1976; the audit made extensive specific findings in connection with deficiencies in capital accounting; i. e., the area for which Womack was primarily responsible. The internal audit team found, for example, calculation of depreciation expense did not always reflect the declining life of the asset where applicable, depreciation expense calculations did not always agree with established rates, depreciation was being charged against assets which were already fully depreciated, debit balances remained in the reserve account for assets which had been retired before they were fully depreciated, and the asset ledger contained small debit and credit balances which were created when assets were retired (Exhibit 13 at 4, 21–22). The audit also set forth specific "follow-up" directions in connection with the deficiencies noted (Exhibit 13 at 8). The deficiencies identified by the internal audit team were not

limited to capital accounting; a significant portion of the findings, however, dealt with that area. The Head Office internal audit demonstrated to Jacobs that the problems in the capital accounting area were more severe than he had realized (Jacobs at 276–77).

36. On September 3, 1976, Shell's General Manager of Chemical Plants, General Manager of Production Finance, Finance Manager of the Agriculture Division, Finance Manager of Chemical Manufacturing and Distribution, General Auditor's representative, Manager of Chemical Products Auditing and the members of Head Office internal audit team met with the Mobile Plant Manager (Martin), Plant Controller Jacobs and all other Mobile Plant Department Managers and reviewed the audit of the Mobile Plant (Exhibit 13 at 2; Jacobs at 241–42).

37. In early October 1976, Jacobs concluded that the Womack's repeated performance shortcomings detected since the last performance appraisal (February 1976), indicated a need for an *interim* performance discussion with Womack (Jacobs at 80, 132–33). At that time, Jacobs sought the advice of Mobile Plant Employee Relations Manager Frank McGrath, who was responsible for monitoring the performance appraisal program (McGrath at 8–9). Jacobs expressed concern that Womack had demonstrated no real progress in relation to items discussed in the 1975 and 1976 performance Appraisal Reports. Jacobs was particularly concerned with Womack's poor organization and planning, his lack of problem-solving ability, his failure to recognize the purpose for assigned tasks, and his insufficient understanding of capital asset accounting theory. Jacobs advised McGrath that Womack was accomplishing only route, primarily clerical, work and that Womack offered little, if any, professional input. McGrath advised Jacobs to conduct regular organization and planning meetings with Womack and to have Womack prepare an hour-by-hour schedule of the tasks to be performed and the time required to complete each task. Through such steps, McGrath felt Jacobs could help Womack prepare a methodology for approaching specific tasks. McGrath also suggested that Jacobs review Shell's Capital Manual section by section with Womack until Womack understood the theory behind the capital accounting tasks he was expected to perform (McGrath at 30; Exhibit 22).

38. Although McGrath was aware that Womack had discussed his February 1976 performance Appraisal Report with the Mobile Plant Manager and that Jacobs had questioned Womack's performance prior to October 1976, McGrath had not become actively involved. After October 1976, McGrath met with Jacobs "periodically" to review Womack's progress (McGrath at 47–48).[12] McGrath also reviewed each of Womack's prior performance Appraisal Reports and independently validated Jacobs' evaluations. The review effort was somewhat difficult because no group outside the Financial Department had a sufficiently close relationship with Womack to afford a broad evaluation. Consequently, McGrath contacted a member of the Head Office internal audit team (Gene Kenyon) since a number of the deficiencies identified in the 1976 Mobile Plant audit were within Womack's area of responsibility; i. e., capital accounting. In 1975, Kenyon (Consolidated Chemical Accounts at Head Office) had regular telephone dealings with Womack regarding certain accounts. Kenyon advised that Womack had repeatedly made errors in recording transactions even after Kenyon had explained the procedure to Womack step-by-step. Kenyon concluded that Womack was generally unfamiliar with the capital area and that Womack's work product was "slipshod" (Exhibit 22 at 1–2).

39. On October 13, 1976, in preparation for the interim performance discussion, Jacobs reviewed Womack's personnel file and prepared a summary of Womack's work history at Shell:

*HISTORY OF J. N. WOMACK*

---

12. McGrath's review ultimately resulted in a detailed memorandum dated August 9, 1977 (Exhibit 22) regarding Womack's job performance.

PURPOSE—To give Joe [Womack] an interim review due to concern about his performance since last formal review given in Feb. 1976.

I.   Aug. 1974

A.   Job content was clerical in nature at that time.

B.   PLANT ACTIVITY

1.   Not a great deal of activity plant only had approx 70 employees.

2.   Transactional activity not very heavy we only averaged 400–500 invoices per month.

3.   During this period month end reporting requirements where changed requiring significantly more in formation.  Joe had a great deal of difficulty in establishing a method to control and report plant costs.  We finally had to sit down and work up a control worksheet for him to use to tie out his work and then show him how to do it.  Once the activity was highly structured he was able to do a fairly good job of filling in the blanks.

II.   Jan. 1975 Appraisal of JNW's [Womack] performance

A.   At that time the appraisal reflected a lack of understanding by Joe of the reasons and logic for the activities; although he could execute the basic mechanics.

B.   Noted that his problem solving skills were weak and any changes in routine or abnormal occurrences appeared to baffle him.

C.   Did not show level of professional job understanding he should have at that time.

D.   He was told he needed to improve his technical and professional knowledge of accounting.

E.   Was told he needed to improve his organizational skill—need to organize his job and time more effectively.

F.   He was told he needed to work on getting his point across more effectively.  Frequently appeared not to understand subjects clearly and had difficulty expressing himself.

G.   It was agreed at the time of the review to try and remove a lot of the clerical responsibilities from Joe and make his job more professional in content.

III.   March 1976—Appraisal & Review [February 1976 performance Appraisal Report]

A.   Joe's job had been restructured and a lot of the clerical activities were taken away from him.  We attempted to make his job more professional.

B.   The appraisal reflected many of the problems that existed in the previous appraisal.

1.   Continuing problem with organizing work, problem solving and work understanding.

2.   After over 2 years of working in Capital area, still lacked knowledge of Company Capital policy.

3.   Areas requiring improvement were same as previous review; i. e., problem solving, organizational skill, job understanding.

Joe was not pleased with his appraisal and requested to discuss subject with [Mobile Plant Manager] Martin, which he was allowed to do.  I feel he concluded from that discussion that he needed to work on improving skills.

(Exhibit 11 at 15–18).

40.   As indicated, Jacobs' "history" noted that Womack "needed to improve his technical and professional knowledge of accounting."   After further consultation, McGrath and Jacobs concluded that a review of Womack's educational background in accounting was necessary.  In mid-October 1976, Jacobs wrote the Office of the Registrar of St. Paul's College and requested Womack's college transcript (McGrath at 43–44; Jacobs at 130–31).  St. Paul's College subsequently furnished Shell's Employee Relations Department with a copy of a transcript;  Womack possessed 24 hours accounting credit and earned the following grades:

| Course Number | Descriptive Title | Grade | Semester Hours |
|---|---|---|---|
| Accounting | | | |
| 261 | Principles of Accounting | D | 3 |
| 262 | Principles of Accounting | D | 3 |
| 361 | Intermediate Accounting | D | 3 |

| Course Number | Descriptive Title | Grade | Semester Hours |
|---|---|---|---|
| Accounting | | | |
| 362 | Intermediate Accounting | C | 3 |
| 431 | Income Tax Accounting | B | 3 |
| 461 | Advanced Accounting | C | 3 |
| 432 | Cost Accounting | D | 3 |
| 462 | Advanced Accounting | C | 3 |

(Exhibit 20; McGrath at 43).

41. In further preparation for the interim performance discussion with Womack, Jacobs also prepared a list of "examples" of problems that Womack had experienced since his February 1976 performance appraisal:

*Problems with [Womack] since Feb 76 Review*

1. Asked Joe for a list of objectives on March 25th (part of review planning). Made second request in June—still don't have them.

2. Calls from Head Office on late Capital reports.

3. Delays in completing internal audits.

4. Head Office Audit—many of the significant items were in JNW's [Womack] area of responsibility. See Capital section of audit write up for significant item.

5. Did not show up one month after military leave [on the day] when Jr [Journal] 12 was due.

6. Closed work order information was consistently late during 1st half of year.

7. Aug status of accounts was 2 weeks late and he didn't have any of it done requiring supervisory staff to do it and report accounts delinquent. I myself end up doing the work on Saturday and Sunday.... Joe's only excuse was that he had a big weekend which was and inexcusable since he was already two weeks late.

8. List of his job responsibilities was asked for on 7/16/76 due date 7/30/76. Reminder given 8/23/76. Still not yet done. This was not a case of work but in my opinion lack of determination on Joe's part.

9. New AFE. [Authorization for Expenditure] form issued with Cost Manual but JNW did not pursue getting people to use them for months.

10. Azeala City travel procedures need analysis. Joe was given the project due date on 7/27/76. Not done follow up 9/2/76. Still not done. In this instance Joe didn't say anything to me. It was just as if he didn't care.

11. Asked to complete Asset Verification by May status. He was late and said everything had been verified later he said he had missed some categories.

[Exhibit 11 at 10–14 (summary); Exhibit 11 at 23–48 (details); Jacobs at 134].

42. On October 20, 1976, Jacobs conducted the interim performance discussion with Womack. Jacobs requested that Womack assess his own progress since the February 1976 performance appraisal. Womack admitted that he had experienced work organization and planning problems, resulting in late or incomplete work. Womack frankly admitted that his technical expertise (capital accounting, account analysis) had not developed as rapidly as he would have liked after two and one half years with Shell. Finally, Womack admitted that his performance in certain job areas was less than acceptable (e. g., status of accounts in capital accounting as reported by the Head Office internal audit team). After Womack completed his assessment, Jacobs suggested that he (Jacobs) and Womack conduct weekly organization and planning sessions, in order to provide ongoing work evaluation and to ensure efficient time allocation. Jacobs and Womack agreed that they would engage in organization and planning sessions at a specified time each Monday morning *unless* cancelled by mutual consent or by Jacobs (Jacobs at 135–36; Exhibit 11 1–7).

43. Following the interim performance discussion, Jacobs advised Womack's immediate supervisor (Financial Representative Stark) that he (Jacobs) and Womack had

scheduled regular organization and planning sessions; Jacobs requested that Stark keep a record of any careless errors made by Womack to facilitate the ongoing evaluation (Jacobs at 136–37, 139).

44. The following Friday (October 22, 1976), Jacobs and Womack met and outlined the goals to be accomplished at the organization and planning sessions. Jacobs instructed Womack not only to prepare a detailed list of his work activities but also to clean and reorganize his (Womack's) desk by November 1, 1976 (Exhibit 11 at 49).

45. On Monday, November 1, 1976, Jacobs and Womack had the first organization and planning session. Although Womack had prepared the requested outline of goals to be accomplished, he had not cleaned or reorganized his desk. At the session, Womack and Jacobs

> agreed that the second weeks' action item was for [Womack] to take his list of responsibilities and plot them on a calendar. This approach will highlight any free time [Womack] may have and will also function as his plan to get his work completed. He [Womack] agreed that the approach we were taking to help him organize his work more effectively was good. We also talked about the plotting of his time effort as a tool for he and I [Jacobs] to measure his actual performance against his plan. I emphasized to him that the work plan was his plan and that the execution of the plan relied strictly on his personal discipline to accomplish it.

(Exhibit 11 at 51).

46. The following Monday (November 8, 1976), Jacobs and Womack participated in another organization and planning meeting. Jacobs and Womack discussed specific task procedures (work in progress "tie outs," chemical work order analysis, capital asset analysis). After the session Jacobs noted:

> Joe had his list of job activities completed as agreed they were broken down between monthly required, quarterly, annual and special projects. He had not completed the reorganization of his desk.

We agreed that the second weeks meetings action item was for him to take his list of responsibilities and plot them on a calendar for the next four months. This will allow him to pin down his available free time and more effectively monitor his efforts. Once he has developed his plan then we will monitor his execution against his plan.

(Jacobs Exhibit 11 at 53).

47. Organization and planning sessions were not held on November 15th or November 22nd because Womack and Jacobs were each on vacation during a portion of that time (Exhibit 11 at 55). On Monday (November 29, 1976), however, Jacobs and Womack had their regular session at which time they:

> Reviewed [Womack's] progress in more effectively organizing his work. The concept of displaying on the calendar appears to be helping. However still needs to work on recognizing opportunities to consolidate work to open up large blocks of time for special projects. So far this effort doesn't appear to have effect any significant change in quantity or quality of work.

(Exhibit 11 at 57).

48. At the next weekly session (December 6, 1976), Jacobs and Womack agreed that during December Jacobs should spend time reviewing in detail with Womack his (Womack's) procedures for processing his work. Although Womack agreed that he would advise Jacobs when he was ready to commence the review, he subsequently failed to do so (Exhibit 11 at 57).

49. No organization and planning sessions were held between December 7, 1976, and January 4, 1977. On December 13th the Financial Department was engaged in closing accounts and on December 20th Jacobs was on vacation (Exhibit 11 at 57). When the weekly reviews had begun in October 1976, Jacobs made it a practice to remind Womack each Monday morning that a session would be held in Jacobs' office. On Monday, January 10th, Jacobs did not remind Womack that a session was scheduled and Womack failed to appear:

[Womack] did not come in for his planning meeting. Furthermore he never approached me [Jacobs] on the detailed review meeting agreed to on 11/29/76. . . . On 12/14/76 we uncovered a significant error on the allocation of overheads for November business. This is a job responsibility that [Womack] has been performing for over two years. The error was careless and could have been avoided if he had been paying attention. . . .

Again Joe was delinquent on completing his status of accounts. And those that were done were incomplete and unprofessional.

This concerns me a great deal since we had discussed this problem in October. Again his lack of performance caused other members of the Finance Dept. as well as other departments unnecessary work. This performance short coming must be corrected. Specifically I had to assist again in trying to reconcile some of the accounts. The major one being Stores Stock Account 5701.

(Exhibit 11 at 57; Jacobs at 139–40).

50. On January 12, 1977, Jacobs noted another significant error:

Joe [Womack] made a significant error in judgment when he used the wrong report to generate the data for the month end financial reports for Dec 1976. The correction of the error required significant effort to be expend[ed] by myself & Mr. T. L. Stark to get us back on stream. My key concern on this occurrence is not the error itself but the fact that after 2½ years (7 months with computer output) handling this activity Joe would not recognize he was using the wrong data for his report. Furthermore that he would not really understand till the last minute that he was using incorrect data. His lack of problem solving skills continues to be a significant problem for him. We need to continue to work on this with him.

(Exhibit 11 at 64). On January 20, 1977, Jacobs again noted:

Joe still needs to work on his planning skills. Reports are still being done at the last minutes in requiring us to telefax the data to Houston—i. e., Initial Assets by Year of Acquisition report.

(Exhibit 11 at 66).

51. The weekly organization and planning sessions were to assist Womack in scheduling and completing his work. On October 20, 1976, Womack and Jacobs had agreed that regular *interim performance appraisals* regarding Womack's progress would also be helpful. At Womack's request, Jacobs conducted an interim performance appraisal/discussion on January 24, 1977 (Exhibit 11 at 68). Jacobs explained that Womack "was not making adequate progress in correcting his shortcomings." Jacobs emphasized that Womack "was still having significant difficulty completing work in a timely manner and that things were not being done in a professional manner" (Exhibit 11 at 68). Jacobs reviewed samples of "careless errors" that Womack made in November and December 1976 and explained that he (Jacobs) would not be concerned if the examples were the *only* errors. Jacobs explained, however, that the cited errors were merely "examples of a running trend of careless mistakes that [caused] other people to expend significant effort to correct" and that the errors were occurring in areas in which Womack had been working for over two years. Jacobs informed Womack that with his (Womack's) experience, Womack "should be making errors on a rare occasion." Jacobs further counseled that Womack "ranked very low in relation to other entry level personnel" and advised that Womack "needed to make a significant and sustained improvement in his performance." Although planning calendars *prepared by Womack* indicated that Womack should accomplish "all of his routine duties with five to seven days each month available for other projects", Womack responded that he (Womack) had reassessed his work and "had concluded that he needed to be one hundred percent on capital." Jacobs advised Womack that he (Jacobs) was not convinced that the Mobile Plant required a fulltime Capital Accountant and requested that Womack submit a

proposal substantiating the need for a full-time Capital Accountant. Womack agreed to prepare the proposal within four days (Jacobs at 213–15; Exhibit 11 at 69). Jacobs further

> explained that many times getting everything done may mean working a few Saturdays or staying late in the evening. That acceptable performance as a professional accountant requires getting the job done on time and in a complete manner regardless of how much time it took; taking into consideration that excessive over time was not good either.

(Exhibit 11 at 68–69). After the discussion, Jacobs noted that he (Jacobs) had not observed any real overtime or extra effort on Womack's part "to accomplish all of his tasks" but that Womack "can't seem to accomplish [such tasks] in a forty hour week" (Exhibit 11 at 68–69).

52. After Womack advised Jacobs that capital accounting was a full-time job at the Mobile Plant, Jacobs discussed that proposition with McGrath. McGrath advised Jacobs to investigate other comparably sized Shell chemical plants in order to determine the time required to perform capital accounting at such plants. Jacobs made an investigation and ascertained that at one comparable chemical plant he had contacted, the capital desk was handled by a non-professional. At another comparable chemical plant, the capital desk not only performed capital accounting, but also performed a number of closing and cost accounting activities as well (Jacobs at 215–18; Exhibit 11 at 127–30; Exhibit 22).

53. On the designated day (January 28, 1977), Womack informed Jacobs that he (Womack) had not completed the report substantiating the purported need for a full-time Capital Accountant. Womack requested, and Jacobs granted, a one week extension to complete the report (Exhibit 11 at 70). The following week, Womack did submit a memorandum entitled "Capital Accounting" (Exhibit 11 at 78). The report did not, however, "define the . . . effort [time] required to complete the various capital accounting tasks." Womack explained

that he had not yet completed that section of his report but "was working on it" (Exhibit 11 at 76).

54. On January 31, 1977, Shell's Head Office transmitted to the Mobile Plant its annual request for submission of data for use in federal income tax schedules for 1976 (T–Schedules) (Exhibit 11 at 72–73). Womack had prepared the T–Schedules for 1975 and had the responsibility for performing the T–Schedule work requested by the Head Office (Exhibit 12 at 30–34; Jacobs at 144, 147). Womack noted in the February 24th box of his February 1977 calendar and the unnumbered February 28th box of his March 1977 calendar that the "T–Schedule [was] due March 17th" (Exhibit 11 at 109–110; Jacobs at 160–63). Stark also reminded Womack that the T–Schedules were due on March the seventeenth (Jacobs at 159).

55. On Friday, February 4, 1977, Womack advised his immediate supervisor (Financial Representative Stark), that a particular accounting journal ("JR2", a journal critical to the monthly closing of the Mobile Plant's books) was ready to go and would be available for transmission to Head Office by Monday morning. Womack reported ill on Monday, however, and Jacobs was required to complete preparation of the journal. In preparing the journal, Jacobs determined that Womack had failed to complete a prerequisite and that Womack departed on Friday "leaving a significant amount of effort to be accomplished on Monday morning." Womack's failure to complete his work in a timely fashion "delayed transmission" of the journal to Head Office until Tuesday and jeopardized timely closing of the Mobile Plant's books (Exhibit 11 at 80).

56. Since 1975, Womack had the continuing responsibility for reconciling each month the general ledger maintained by the Financial Department and the subsidiary ledger maintained by the Stores Department for Stores Stock account 5701 (Jacobs at 61–62, 67, 74, 177; Exhibit 10 at 1). The 1976 Head Office internal audit team had recommended that the Mobile Plant implement month-end accruals to represent better the actual value of the Stores Stock

(Womack at 113; Jacobs at 62, 70, 74; Exhibit 13 at 11). Prior to implementation of the auditors' recommendations, no significant problem in reconciling the Stores Stock Account had been encountered (Jacobs at 61). The necessity of reconciling the Stores Stock Account is simply explained. The Mobile Plant Stores Department maintains an inventory of items in the Store Room. At the end of each month, the Stores Department sends the Financial Department a list of stock issues (out-going stock) and receipts (in-coming stock) which the Financial Department records in Shell's financial records. Due to an outstanding invoice or the failure to record a receipt, there is often a discrepancy between the balance of Stores Stock Account as recorded by the Financial Department and the balance of the Stores Stock Account as recorded by the Stores Department. These discrepancies must be identified and reconciled each month [13] (Jacobs at 67–68). Determining each item recorded by the Stores Department and not recorded by the Financial Department and vice versa is a prerequisite to ascertaining the true balance of the Stores Stock Account and making adjusting entries (Jacobs at 77, 175, 177).

57. Womack had sought Jacobs' assistance in reconciling the Stores Stock Account in October 1976 (Jacobs at 63, Exhibit 11 at 17). Consequently, Jacobs undertook development of a technique for instructing Womack how to isolate the Stock issues and receipts in order to pinpoint the exact items causing the differences in the general ledger maintained by the Financial Department and the subsidiary ledgers maintained by the Stores Department (Jacobs at 182; Exhibit 10 at 17; Exhibit 11 at 57). In January 1977, Jacobs assisted Womack in reconciling the Stores Stock Account from May 1976 through September 1976 (Exhibit 11 at 57; Exhibit 10 at 12–16).

58. On February 18, 1977, Jacobs thoroughly reviewed the procedure for reconciling the Stores Account 5701 with Womack, utilizing work Jacobs had already completed. Jacobs explained "that in many instances the reconciliation effort required comparison of each transaction booked by [the] Finance [Department] against those recorded by the stores organization." Womack expressed understanding of the process and agreed to complete the reconciliation in time to make February's correcting entries (Jacobs at 70–71; Exhibit 11 at 82).

59. At the same meeting, Jacobs and Womack also discussed Womack's report (originally due three weeks earlier) substantiating the need for a full-time Capital Accountant at the Mobile Plant. Jacobs instructed Womack to prepare a one-year chart detailing the tasks that Womack performed each month and the man-hours required to complete each task. Jacobs explained that such an analysis was essential if Jacobs was to assess properly whether the Mobile Plant required a full-time Capital Accountant. Womack agreed to prepare the schedule within the next "couple of weeks." Jacobs also reminded Womack that Womack had not appeared for an organization and planning session in several weeks and that the meetings should be renewed, as agreed (Exhibit 11 at 82).

60. The following Monday, February 21, 1977, Jacobs and Womack had an organization and planning session and discussed the need to continue the weekly meetings. The two agreed that the sessions should be used to review thoroughly specific work product and to evaluate how Womack was approaching and performing each task. At the session, Jacobs and Womack agreed that the Chemical Work Order System (CWOS) would be reviewed and analyzed at the next session (Exhibit 11 at 85).

61. Womack was not available on Monday, February 28, 1977, to attend the morning organization and planning session as scheduled. At the scheduled time, Womack was attending the funeral of his fiancee's uncle. Upon his return, Womack did not

---

**13.** The monthly reconciliation of the Stores Stock Account is analogous to the process of reconciling the account balance recorded in a checkbook with the account balance on a bank statement (Jacobs at 174–175).

contact Jacobs regarding the CWOS review and Jacobs noted:

> [Womack] still has not submitted the detailed time study on [the] Capital Accounts job that was discussed with Joe on 2/21/77. The initial committment was made on January 24 with a due date of January 28th. This lack of concern for meeting due dates continues to permeate Joe's performance. He just does not wish to put out the extra effort required to complete tasks assigned.

(Jacobs Exhibit 11 at 87–88),

62. The next Monday, March 7, 1977, Womack "again did not show up for Monday morning review meeting" nor had Womack "submitted his detailed time study on the Capital job" (Exhibit 11 at 92).

63. On the same date (March 7, 1977), Jacobs gave Womack a "Personal Review Worksheet" and requested that Womack complete the worksheet prior to commencing his (Womack's) vacation on Friday, March 18, 1976 (Exhibit 11 at 92, 110). In the Financial Department at the Mobile Plant, the "Personal Review Worksheet" is an integral part of the performance appraisal program; the worksheet provides employee input into the performance appraisal discussion. The worksheet contained fourteen questions to be answered by the employee and provided:

> The worksheet will help you prepare for a discussion with your supervisor. These questions are intended to help you think objectively about your job, your assignments, your capabilities in handling these assignments, and your future. Do not feel limited in your discussion to questions listed. On the other hand, don't feel that an item must be covered if it seems inappropriate. A sincere, constructive discussion between you and your supervisor should be of value to you, your supervisor and the Company.

(Exhibit 17 at 13; Exhibit 45).

64. On March 15, 1977, Stark reminded Womack that Womack was scheduled to submit the C–535 Report for joint review at 1:00 p. m. on the next day (Exhibit 11 at 94–95). The C–535 Report is a capital asset schedule that is a year-end report displaying capital information (Jacobs at 159). Womack had prepared the C–535 report in 1976 and had noted its 1977 due date in the February 28th box of his February 1977 calendar (Exhibit 11 at 109; Jacobs at 161–62). At the March 16th meeting, Womack asked Stark for assistance in understanding and preparing the C–535 Report. Womack stated he had forgotten how he had prepared the C–535 Report the year before and had failed to keep notes of his work. Stark reviewed the format of the C–535 Report with Womack through use of the previous year's report which Stark found to contain errors (Exhibit 11 at 94–95).

65. March 17, 1977, was Womack's last scheduled work day prior to his vacation (March 18, 1977 through March 27, 1977). Prior to his vacation, Womack did not submit either the "Personal Review Worksheet" or the time study of the Capital account job (Exhibit 11 at 100, 109).

66. Womack did submit the T–Schedules and the C–535 depreciation report to Jacobs on March 17, 1977 (Exhibit 11 at 100; Exhibit 12 at 26–29; Jacobs at 189–90). The submitted documents, however, were neither complete nor correct. At that time, Jacobs made the following note:

> [Womack] gave me T–Schedule data that should be mailed 3/18/77 which part of worksheets were not filled out yet and part of it he can't figure out why it doesn't tie out. [F]irst any of this was known to me was at 3:45 3/17/77.

(Exhibit 11 at 105). Jacobs and Stark reviewed the C–535 report and determined it was incorrect (Exhibit 11 at 100).

67. Upon further examination of the T–Schedules submitted by Womack, Jacobs discovered that certain columns of figures totaled by Womack were not added correctly [14] (Jacobs at 147, 153, and 156). In re-

---

**14.** An example of Womack's arithmetical mistakes is in the "CLOSING BALANCE" portion of Womack's first T–Schedule in the column entitled "Depreciable"; the figures in that col-

umn do not add up to the total figure at the bottom of the column (Exhibit 12 at 26; Jacobs at 148).

viewing the T–Schedules, Jacobs also discovered that many of the figures recorded on Womack's T–Schedules, which were supposed to be drawn directly from books and records maintained by Womack at the Mobile Plant, did not match the pertinent data contained in those sources (Jacobs at 156–157). The erroneous calculations and absent data in Womack's T–Schedules reflected that Womack had not followed the express instructions set out in Shell's procedural manual for completing the T–Schedules (Jacobs at 158).

68. The T–Schedules were due in Houston the following Monday, March 21, 1977. Since Womack left on vacation, Jacobs had to redo completely the T–Schedules "from scratch" (Exhibit 12 at 1–7; Jacobs at 149). Jacobs spent two-and-one-half days preparing the T–Schedules including work at home over the weekend (Exhibit 11 at 100; Jacobs at 151). Jacobs found that Womack had made errors in the 1975 T–Schedules; the errors made correct computation of the 1976 T–Schedules impossible without some form of modification (Jacobs at 154). Since the data on the 1975 T–Schedules had been reported to the Internal Revenue System, the information was not subject to change (Jacobs at 154). Jacobs, therefore, contacted Shell's Head Office in Houston and obtained approval to make adjustments for mistakes in the 1975 T–Schedules within the columns of the 1976 T–Schedules in order to provide an accurate report in the 1976 T–Schedules (Jacobs at 154–55; Exhibit 11 at 118).

69. The erroneous C–535 report submitted by Womack was also due in Houston on the afternoon of March 21, 1977. After Stark and Jacobs reviewed the report, Stark spent all day Saturday, March 19, 1977, reworking the C–535 Report. The C–535 Report was retyped on Monday, March 21, 1977, and sent to Head Office in Houston (Exhibit 11 at 100).

70. On Monday, March 28, 1977, Womack returned from vacation. Jacobs met with Womack and expressed dissatisfaction that Womack had left for vacation without completing the annual tax depreciation schedules (T–Schedules) and the C–535 depreciation report. Jacobs stated that Womack had been afforded six weeks to complete the reports and that his failure to do so was inexcusable. Womack simply replied that he had been telling Jacobs that he [Womack] had too much to do. Jacobs responded that Womack had not demonstrated extra effort in an attempt to accomplish tasks and that he were was unable to complete work he should so advise Jacobs or Stark rather than leaving incomplete work on Jacobs' or Stark's desk the day before the work was due. Jacobs told Womack that he (Jacobs) and Stark had been required to expend a weekend completing Womack's incomplete work (Exhibit 11 at 124).

71. After Womack returned from vacation, he completed his Personal Review Worksheet; Jacobs had requested he complete the worksheet *before* leaving on vacation. Although Womack's report substantiating the need for a fulltime Capital Accountant at the Mobile Plant was already two months late, Womack's worksheet responses described himself as the "in-house Capital expert," and focused upon the need to devote additional time to Capital accounting tasks rather than "miscellaneous type jobs which do nothing except use up time." In the worksheet, Womack further stated that he (Womack) had "upgraded" his knowledge of capital accounting (Exhibit 45).

72. On March 30, 1977, Jacobs with significant input from Stark completed Womack's annual performance Appraisal Report for the period February 1976 through February 1977 (Exhibit 4, Jacobs at 89). The March 30, 1977, performance Appraisal Report is the basis of Womack's promotion claim. Womack did not testify that the appraisal itself was racially motivated; rather, he testified that he believed that the appraisal was indirectly the result of Jacobs' failure to communicate with him and that such failure was because Womack was

black (Womack at 64–67, 114–117, 215–220). The Appraisal Report provides:

## JOB PERFORMANCE

### WORK ASSIGNMENT

[Womack] is responsible for all capital activity which includes all capital reporting. . . . In addition he is required to advise all Plant departments of the Shell Capital Policies and Procedures. He was expected to handle all of these activities on a current basis reflecting a professional knowledge of Capital accounting while doing so. Mr. Womack also had responsibilities for a few monthly accounting journals. . . . He was expected to demonstrate a thorough knowledge of the journal's contents and be able to substantiate their integrity. In addition [Womack] was to organize his work in the Capital and Closing Journals to allow time to handle some internal auditing and special projects. In addition, Mr. Womack was to have analyzed the accounts he was responsible for to insure the integrity of the balance.

### RESULTS PRODUCED

Mr. Womack has not obtained the level of expertise in the Capital area he should have, especially in light of the fact he has been doing Capital for three years. He still has a lack of a clear understanding of how to do some aspects of Capital. An example is, he still does not know how to do the year-end Capital tax schedule [T–Schedule] and truly understand their purpose, even though he has been handling the report for over three years.

Furthermore, he has not shown any real effort to improve his understanding. On a number of occasions, we have suggested he read the Capital Asset Manual for complete understanding. Also the manual for preparation of Capital tax reports. Even though he is behind in some areas of his responsibilities, he makes no effort to put in extra time to bring them to a current level. On some occasions, work was even left incomplete requiring supervisors to complete, i. e., August 1976 Status of Account, 1976 T–Schedules for

Capital accounting to Tax Department. His monthly journals appear to take an inordinate amount of time to complete and frequently have careless errors. His account analysis (status of accounts) has been delinquent and is often incomplete. Specific examples are: Store stock account and Raw & Processed Material Account, which has not been completely reconciled for six months. In general, Mr. Womack has not developed the professional knowledge of his areas of responsibility he should have. Even with direct assistance from supervisors he has shown little, if any, improvement in his performance. A significant amount of time has been spent by the Plant Controller [Jacobs] via weekly work meetings with Mr. Womack to help him organize his work and improve his performance.

## PERFORMANCE FACTORS

### JOB KNOWLEDGE

Employee has basic understanding of recurring duties, but has difficulty handling changes or activities that occur on an infrequent basis even though he has handled tasks before.

### PROFESSIONAL KNOWLEDGE

Below average for entry level individual even though he has been handling Capital Accounting for 3 years. Does not apply academic training in accounting.

### PROBLEM SOLVING

Employee has great difficulty in this area. As noted in previous reviews, can't seem to think through problems to a sound decision.

### PLANNING AND ORGANIZATION

Employee is weak in this area. He has been advised of this shortcoming and has made some minor progress, but still has a long way to go. The Plant Controller [Jacobs] has spent a significant amount of time with the individual trying to help him improve his performance.

### CONTROLLING COSTS

Does not question necessity of certain information to determine if reports are truly needed. Does not use his time efficiently.

*INTERPERSONAL RELATIONS*

Mr. Womack handles interpersonal relationships reasonably well. Does not cause friction with fellow workers.

*WRITTEN EXPRESSION*

Does reasonably well in this area when required, but has little occasion to use this medium.

*ORAL EXPRESSION*

Average diction. Has some difficulty in front of a group. Additional exposure will improve this area.

\*     \*     \*     \*     \*     \*

*SELF DEVELOPMENT*

Listens to suggestions and agrees that he needs to do some work, but doesn't execute. He has made little progress in improving organization skills and problem solving skills. Does not seem to want to put out effort required.

\*     \*     \*     \*     \*     \*

## APPRAISAL SUMMARY

*Summarize greatest strengths.*

(1) Mixes well with people and enters discussions with ease.

(2) Handles himself in a mature manner when dealing with others.

(3) Neat and tidy in personal appearance.

*Summarize principal job areas where improvement is needed.*

(1) Organizing job assignments.

(2) Complete tasks in a timely manner; not wait until last minute to complete.

(3) Needs to develop ability to analyze.

(4) Improve quality and quantity of work.

(5) Needs to attack job with more dedication; be willing to put out effort to accomplish tasks.

*If you were filling a position in employee's area of specialty, would you :*

[ ] Prefer over others    [X] Rather not have
[ ] Willingly accept    [ ] Definitely not want

*If employee has three years or less Shell service, or is considered an inadequate performer, should employment be continued ?*

This is based on significant upgrading of the employee's quality of performance. Mr. Womack's continued employment is in question. Significant improvement must be made. He is aware of the areas needing improvement; however, he does not appear willing to put forth the effort. (Exhibit 4 at 1–3).

73. After Jacobs prepared and Womack had reviewed the job performance Appraisal Report, Jacobs conducted a performance discussion with Womack (Womack at 181). Following the performance discussion, Jacobs completed the "Performance Discussion" portion of the Appraisal Report:

## PERFORMANCE DISCUSSION

*Significant items discussed of importance to management :*

Mr. Womack was advised, again, that his performance is unacceptable and he must do something to make significant and sustained improvement in it; otherwise, we would have to get someone else who could get the job done.

*What are stated career objectives ?*

Would like to achieve position in financial organization where he would be able to supervise and direct others.

## CAREER PLANNING

*DEVELOPMENT PLANS RECOMMENDED (e. g., special assignments, management or professional study courses, and training activities).*

(1) Recommend significant use of outside studying and reading;

(2) Continue to pursue working sessions [weekly organization and planning sessions] with employee to develop his organizational skills.

(Exhibit 4 at 3). Under the "Comments" portion of the report Jacobs noted "employee is not competitive with his peer group within his classification [and] [n]eeds to im-

prove a great deal to reach competitive level" (Exhibit 4 at 4).[15]

74. During the performance discussion (Exhibit 11 at 131–134), Jacobs advised Womack that he (Jacobs) "was still dissatisfied with his [Womack's] performance and that [the two] needed to do something to improve it" (Exhibit 11 at 131). Jacobs reviewed with Womack the capital accounting work deficiencies noted by the Head Office internal audit team and discussed Womack's inability to complete his work in a timely fashion. Womack replied that he had too much work and that he had been "just too busy" to complete the report justifying a full-time Capital Accountant at the Mobile Plant. Jacobs advised Womack that he (Jacobs) had inquired about the capital accounting workload at other comparably sized Shell chemical plants; Jacobs found that such plants had a similar capital workload and that the capital desk at such plants effectively handled the workload (Exhibit 11 at 132). After further discussion, Womack agreed that he needed to reorganize his job (as instructed in January) and improve his motivation. Jacobs closed the discussion by reviewing with Womack his performance rating, which had dropped from a "3" to a "4":

[Womack] was not very pleased with the 4 rating and said he felt it was unfair. He said he might understand a 3 rating, maybe even a low 3, but not a four. I told him that if I gave him a 3 rating I would be saying that he meets all job requirements and that was not the case, especially in light of the performance problems [Womack] has been experiencing for the last 6–12 months. [Jacobs] concluded the discussion by reemphasizing ... that ... [Womack] was the only one that could change his performance. [Jacobs] told [Womack] ... [he] would help any way [he] could, but [Womack] had to want to make the effort.

(Exhibit 11 at 134). In response to summary judgment, Womack suggests that it is

significant that Jacobs rather than Stark (Womack's immediate supervisor) prepared the March 1977 Appraisal Report (Womack Response at 3–4; Womack Affidavit ¶ 8, ¶ 10). It is undisputed that each employee's immediate supervisor generally conducts the performance evaluation and prepares the Appraisal Report (Jacobs at 89–92; Exhibit 16 at 3). Jacobs' uncontroverted testimony, however, fully explained the reasons he (Jacobs) "with significant input from Mr. Stark" prepared the March 1977 Appraisal Report (Jacobs at 89):

[P]rimarily because the previous six months or so, I had been working with [Womack] personally very closely, trying to assist [Womack] in improving his performance.

(Jacobs at 89).

During the period when Stark was there, there was a transition from an organizational structure where all of the people reported directly to me [Jacobs]. And during that period, Stark was promoted to Supervisor. But also during that time frame, [Womack] was having difficulties with his performance, and [Stark] and I both worked with [Womack]. But I took the lead control, primarily because I had a little more time available to try to provide some assistance.

(Jacobs at 112). The undisputed business records demonstrate that Jacobs did devote a substantial amount of time and effort analyzing Womack's work and conducting weekly organization and planning sessions with Womack (Exhibit 10 at 12–16; Exhibit 11 at 1–7, 10–18, 23–49, 50–53, 57, 64–69, 76–78, 82–88; Exhibit 22). Accepting as true that Jacobs' performance appraisal was a departure from the normal practice, Jacobs' uncontroverted testimony fully explains the reasons for such a departure and *no* facts in the record support the inference that such a departure was motivated *in any part* by Womack's race. Indeed, Womack admits that Plant Controller Jacobs subse-

**15.** The performance Appraisal Report was reviewed and executed by Womack's immediate supervisor T. L. Stark on April 12, 1977. The appraisal was reviewed and executed by Plant

Manager Martin on August 12, 1977, and by Employee Relations Manager McGrath on August 4, 1977 (Exhibit 4 at 4).

quently performed a performance appraisal of female accountant Donna Lowery, although her immediate supervisor was Earl Moran (Jacobs at 98, 112).

75. Following Womack's March 1977 Appraisal Report wherein Womack's rating went down from a "3" to a "4", McGrath, pursuant to Mobile Plant policy (McGrath at 14–17, 57), reviewed Womack's Appraisal Report to ensure that the revised rating was a true reflection of Womack's performance. McGrath's review was in accordance with the practice of verifying specific behavior, which would justify a significant rating charge (McGrath at 49–53; Exhibit 22; Exhibit 4 at 4). McGrath once again reviewed Womack's entire work record, including his previous Appraisal Reports (Exhibit 22 at 3).

76. The only Mobile Plant department manager who had any direct dealings with Womack, other than Jacobs, was Technical Manager John Willett; Willett administered the capital expenditure forecast and was involved in funding capital projects (McGrath at 49–54; Exhibit 22). Willett informed McGrath that his limited dealings with Womack indicated that Womack did not have the "level of understanding" that he (Willett) had experienced with accountants who had fewer years of service and that Womack's experience level was typical of a "beginning entry level professional" (McGrath at 52; Exhibit 22). McGrath's review further revealed that during the October 1976—March 1977 period the Financial Department was implementing a number of new computerized account systems and that Womack was responsible for critical input into the closing schedule. Womack had reported that his progress was current and that deadlines would be met. McGrath was advised that on two occasions, Womack had deposited incomplete work papers on Jacobs' desk and that Womack had left the Mobile Plant without completing the task. Jacobs and Womack's immediate supervisor, Stark, were required to remain at the Mobile Plant until the early morning hours to complete the task in a timely fashion. McGrath's review continued throughout June and July 1977 (Exhibit 22 at 2–3).

77. On April 3, 1977, Jacobs met with Womack and asked about the status of the Stores Stock Account; Womack had done nothing towards the reconciliation. Again Jacobs showed Womack in great detail, using Jacobs' May—November 1976 reconciliations (Exhibit 10 at 11–19), how to perform the reconciliation; Jacobs pointed out exactly where Jacobs had obtained all necessary data. Jacobs told Womack to consult him if Womack experienced any difficulties with the assignment (Exhibit 11 at 138).

78. On April 18, 1977, Jacobs again met with Womack and discussed the status of the delinquent Stores Stock Account reconciliation. Jacobs instructed Womack that the reconciliation needed to be accomplished no later than April 30th. Womack agreed that the reconciliation needed to be completed within that time frame (Exhibit 11 at 151).

79. On May 26, 1977, Jacobs once again met with Womack to discuss Womack's progress on the Stores Stock Account reconciliation. Womack's previous reconciliation efforts had been unsuccessful because Womack was merely listing the difference between the subsidiary ledger maintained by the Store Department and the general ledger maintained by the Financial Department with no analysis of the transactions that caused the difference (Jacobs at 183–84; Exhibit 10 at 66–69); the simple arithmetic dollar differences between the two accounts failed to identify offsetting transactions (Jacobs at 177, 179). Jacobs reviewed Womack's work papers and then spent two and one-half hours reviewing the December 1976 reconciliation with Womack. After that review, Jacobs believed Womack understood the requirements for reconciling the Stores Stock Account (Exhibit 11 at 154).

80. Following his March 1977 performance appraisal, Womack continued to miss deadlines for reporting data to Houston established by Head Office; on one occasion, Jacobs and Stark were required to work until midnight on two consecutive nights to

complete Womack's work (Exhibit 11 at 135–37, 141, 142, 145, 146, 148). Womack also failed to submit details on how he planned to recognize his work (Exhibit 11 at 148, 151, 157–58). Jacobs continued to hold organizing and planning sessions with Womack (Exhibit 11 at 138–40, 151–53, 154–56) and had E. F. Moran, Senior Technical Analyst, explain the Shell Chemical Work Order System (CWOS) to Womack (Exhibit 11 at 161–65).

81. In early June 1977, Womack approached Employee Relations Manager Frank McGrath and complained that Jacobs' Appraisal Report unfairly rated Womack because of two relatively insignificant errors (Womack at 125–26).[16] Since McGrath had independently reviewed Womack's performance (both in October 1976 and again in April—June 1977) he was familiar with Womack's performance problems. Based upon his conversation with Jacobs, McGrath advised Womack that the Appraisal Report was not based upon two isolated transactions and that Jacobs and Womack apparently had not established full communication during the performance discussion. McGrath counseled Womack to discuss his feelings with Jacobs and offered his (McGrath's) assistance as an intermediary. (McGrath at 45–47; Exhibit 22)

82. On June 16, 1977, Womack once again discussed with Jacobs his performance appraisal and reiterated dissatisfaction with a "4" rating (Exhibit 11 at 166; McGrath at 45; Exhibit 22; Womack at 12526). In response to Womack's contention "that it was unfair for [Jacobs] to lower [Womack's] rating (from a 3 to a 4) just because of two mistakes," Jacobs prepared and reviewed with Womack a two-page list of over twenty examples of performance shortcomings between May 1976 and June 1977 (Exhibit 11 at 166–169). Jacobs noted that:

> [Womack] felt that [Jacobs] had reduced his rating and stopped his raise because he had gone to the [Employee Relations]

Manager and Plant Manager for their comments on previous reviews. [Jacobs] told [Womack] that [Jacobs] had made those channels of communication available to [Womack] to make sure that he had a fair opportunity to express his opinion to everyone he felt he should. I also told [Womack] that the rating was strictly based on the objective assessment of the various performance shortcomings. [Jacobs] further explained that the assessment was not done unilateral[ly], but had significant input from Mr. T. L. Stark, [Womack's] immediate supervisor.

(Exhibit 11 at 166). Womack concluded the discussion by advising Jacobs that he no longer believed that Jacobs had a "personal vendetta" against him (Exhibit 11 at 166–67).

83. Approximately one week later, Womack had a follow-up discussion with Employee Relations Manager McGrath. Womack advised McGrath that he had opened communications with Jacobs, that he had learned that the performance appraisal was not based upon two isolated transactions and that he (Womack) now felt more comfortable with the Appraisal Report (McGrath at 45–47; Exhibit 22 at 4).

84. In response to Womack's concern that a personality conflict adversely affected Jacobs' performance appraisal, in late June 1977 McGrath and Jacobs investigated possible alternative positions for Womack at the Mobile Plant. Womack had expressed some job dissatisfaction (boredom) with capital accounting; furthermore Womack's job performance appraisals consistently reflected that interpersonal relationships were Womack's strongest characteristic. An available position, Purchasing Analyst (buyer) in the Purchasing and General Services Department, seemed to fit Womack's capabilities. The position would afford Womack the opportunity to deal extensively with outside contractors and suppliers as well as with in-house engineering

---

**16.** The two "errors" were the Stores Stock Account reconciliation and preparation of the SEC 10K report for the Mobile Plant (Womack at 114–126). The "10K report" apparently refers to the T–Schedules, as the record (other than Womack's testimony) does otherwise not reflect any problem or disagreement with a 10K report.

and operating personnel. McGrath and Jacobs advised Womack of the possible alternative position and arranged a conference between Womack and A. S. Friloux, Department Manager of Purchasing and General Services.[17] Friloux advised Womack that the position would be at the same job grade (Grade 5) and salary. Womack subsequently advised Jacobs that the offered position was not exactly what Womack wanted and that he (Womack) had decided he would rather stay in the Financial Department and continue capital accounting (Jacobs at 167–170; McGrath at 45; Womack at 224–25, 244–46, 252–55; Exhibit 9; Exhibit 21; Exhibit 11 at 170–171; Exhibit 22 at 4).

85. Approximately one week later on July 15, 1977, Jacobs met both with Womack and his immediate supervisor (Financial Representative Stark). Womack had completed the report purportedly substantiating a need for a full-time Capital Accountant at the Mobile Plant (Exhibit 11 at 174). The report was not prepared in a professional manner.[18] Even Womack's one-page report, which was in preparation for six months, indicated that between eight and ten workdays per month were available for special projects and/or internal auditing. Consequently, Jacobs, Stark and Womack fully discussed utilization of the available days in July for completion of specified tasks assigned Womack. First priority was the still incomplete reconciliation of the "Stores Stock Account"; Jacobs advised that the Stores Stock Account was quite delinquent and would require considerable effort on Womack's part to achieve reconciliation. Womack was advised that reconciliation should be completed no later than July 25, 1977 (Exhibit 11 at 172–173).

86. On July 22, 1977, Jacobs formally advised Womack that the progress he had made to improve his performance since the March 1977 job performance appraisal was insufficient and that he was being placed on two months' probation. Womack was advised that during the probationary period he needed to show dramatic and sustained improvement in all areas of his performance or he would be terminated (Jacobs at 80; Exhibit 9; Womack at 126; Exhibit 11 at 175).

87. On July 25, 1977, Womack presented his work efforts at reconciliation of the Stores Stock Account. The reconciliation was incomplete and Jacobs was advised by Womack's immediate supervisor (Stark) that Womack spent little time attempting to reconcile the account. Jacobs advised Womack that he was disappointed in Womack's progress and Jacobs proceeded to expend three and one-half hours once again taking Womack through the steps required to reconcile the Stores Stock Account (Exhibit 11 at 180, 204–11).

88. Womack finally reconciled the Stores Stock Account between July 25, 1977, and August 4, 1977; except for a $377.83 difference which occurred before May 1976, Womack isolated the transactions contributing to the dollar differences between the balances recorded by the Stores Department and the balances recorded by the Financial Department (Jacobs at 183–

17. When Jacobs first approached Womack regarding an alternative position, Womack inquired whether he was *required* to accept the transfer. Jacobs advised Womack that the alternative position was an opportunity, not a requirement, but that if Womack remained at the capital desk he would have to demonstrate dramatic improvement in the quality and quantity of his work within 60 days or he would be requested to seek other employment (Exhibit 11 at 171).

18. On July 27, 1977, Jacobs submitted to Womack his (Jacobs') own report detailing the job duties and time required to perform the capital accounting function in the Financial Depart-

ment. Because Womack's report failed to provide sufficient itemization, Jacobs wanted to ensure that there were no misunderstandings regarding the job responsibilities of the Capital Accountant at the Mobile Plant, the time required to perform each capital task, and the time available for performing special projects. Jacobs requested Womack to review the data and to discuss any necessary clarifications or questions regarding the job definition or time allocated to various activities (Jacobs at 101–05; Exhibit 11 at 176–179). Jacobs testified that he had never before been required to "detail" an employee's job duties for the employee (Jacobs at 120).

85; Exhibit 10 at 20, 22, 39). Womack recommended that Shell write off the unreconciled $377.83, and Jacobs agreed (Jacobs at 71, 272; Womack at 249; Exhibit 10 at 78). Womack wrote the following explanation for the adjusting entry:

> An intensive review of the monthly reconciliation between store stock and finance was conducted covering the period May 1976 and May 1977.
>
> The amount unreconciliable is $377.83 which occurred before May 1976. Rather than spend any more time and money trying to reconcile the out of balance condition, we are going to write the amount off to [Mobile] Plant expense.

(Exhibit 10 at 78).

89. On August 1, 1977, Jacobs formally supplemented Womack's March 1977 performance Appraisal Report:

### SUPPLEMENT TO J. N. WOMACK'S APPRAISAL REPORT

### AUGUST 1, 1977

Mr. Womack has not made the progress in improving his performance that he agreed to during his performance discussion in March, 1977. Furthermore, he has not made a conscientious effort to do so. His current performance is unsatisfactory and, therefore, I am changing his summary rating code to a 5–0–A.

Mr. Womack was given a formal memorandum of notification on July 22 in which he was advised that he had two months to show a significant and sustained improvement in his performance or he would be asked to seek employment elsewhere.

(Exhibit 46; Jacobs at 79–80). Under the "summary rating code," the "5–0–A" designation signifies:

5—Performance is *significantly below* normal expectations...

    *     *     *     *     *     *

0—Probably not promotable beyond present level within next five years....

    *     *     *     *     *     *

A—Immediate action necessary to correct a problem or to better utilize employee's talents.

(Exhibit 15 at 3–4) (emphasis in original).

90. On August 9, 1977, Employee Relations Manager McGrath prepared a memorandum regarding his review of Womack's job performance to verify the change in Womack's summary rating code from a "4" to a "5." The memorandum included data from both McGrath's initial review as well as the review he undertook after Womack's rating was reduced to a "4" in the March 1977 Appraisal Report (Exhibit 22).

91. On August 15, 1977, Jacobs and Stark conducted an informal interim analysis of Womack's performance. Womack's performance of routine tasks had improved with a "minimum of significant errors" but his performance of special project assignments was still unsatisfactory (Exhibit 11 at 181–182). Jacobs and Stark concluded:

> It is important that we [Jacobs and Stark] effectively evaluate Mr. Womack's progress during the next 30 days as his period of probation will be over in mid to late September. At that time, the decision will need to be made as to whether he has made adequate progress in improving his performance, so that we can honestly say that he is making an acceptable contribution and his employment should be continued, or if he should be asked to seek employment elsewhere.

(Exhibit 11 at 182).

92. On August 18, 1977, Stark and Jacobs held an interim performance review with Womack. Jacobs had exercised supervisory authority over Womack from the time he assumed a position as a Financial Representative at the Mobile Plant and he continued such supervision after he was promoted to Mobile Plant Controller. After Jacobs' promotion, however, Stark became Womack's immediate supervisor. During the interim performance review, Jacobs advised Womack that he (Womack) was timely completing routine monthly duties but was still experiencing problems with specially assigned tasks. Jacobs reviewed with

Womack the itemization he (Jacobs) had prepared detailing Womack's job duties and the hours required to perform such duties and Jacobs inquired whether Womack considered the allocations fair. Womack replied affirmatively and stated that he felt more comfortable and "remotivated." As a special assignment for August 1977, Womack was assigned internal review of Shell's invoice passing function; Womack was to perform the review jointly with Claire Alijamal. Jacobs directed Womack that the task should be completed within two weeks (Exhibit 11 at 189–90).

93. Following the interim performance discussion, Jacobs noted that Womack was making an effort to do a better job and that if Womack continued to make progress, his probation (scheduled to end in mid-September 1977) would be extended on a month-by-month basis in order to determine if the progress was long-term (Jacobs at 173; Exhibit 11 at 189–190).

94. On September 15, 1977, near the conclusion of Womack's two-month probationary period, Jacobs and Stark conducted a detailed assessment of Womack's performance in order to determine whether Womack's probation would be continued or whether his termination would be recommended (Exhibit 11 at 219–223). Jacobs and Stark prepared a summary which compared Womack's "improvements" and his "continued weaknesses" (Exhibit 11 at 221). The two further reviewed a list of Womack's "analytical shortcomings during monthly closings" (Exhibit 11 at 222) and a list of "special projects incomplete or not done" (Exhibit 11 at 223). Based upon their in-depth assessment, Jacobs and Stark concluded:

> Womack has not achieved the level of improvement required to completely satisfy the responsibilities of the Capital Accountant. Secondly, we are of the opinion that the performance . . . more than likely will not improve. . . .

(Exhibit 11 at 219).

95. Consequently, Jacobs and Stark recommended to the Mobile Plant management that Womack be terminated (Jacobs at 193–94; Exhibit 11 at 220). The recommendation was transmitted to Mobile Plant Employee Relations Manager McGrath and subsequently approved (McGrath Affidavit ¶ 18).

96. Prior to the date Womack was to be advised of his termination, exigent circumstances forestalled implementation of the decision. Jacobs learned that Womack had existing medical problems and that Womack had possibly been exposed to a potential medical problem. On October 14, 1977, Jacobs discussed Womack's medical situation and continued unsatisfactory performance with both McGrath and Mobile Plant Manager Martin:

> [McGrath and Martin] felt that due to [Womack's medical situation] . . . . we defer making a decision until both [Womack] and Plant Mgmt. have a better understanding of his medical situation— say 1 to 2 months— . . . we would continue to monitor [Womack's] performance progress.

(Exhibit 11 at 248; McGrath Affidavit ¶ 18).

97. On December 1, 1977, Brown transferred back to the Mobile Plant from Houston as a Financial Representative (Brown Affidavit ¶ 2). Stark subsequently transferred to Houston and Brown became Womack's immediate supervisor (Exhibit 11 at 269).

98. On December 8, 1977, Jacobs met with Brown and Stark (prior to Stark's departure) primarily to update Brown on Womack's performance. The three reviewed Womack's performance during the preceding two months and examined a list prepared by Stark setting forth examples of careless errors Womack had made during the period (Exhibit 11 at 269, 272–76). Jacobs advised Brown that:

> [Shell] still [was] not sure of [Womack's] medical situation and did not at this time want to burden [Womack] with discharge and having to find another position. He wanted to wait till he had a clear picture of his medical situation. However I told them that I had planned after the first of the year to move Joe out of capital and

have him do audits until we could come to a final conclusion on his performance and continued employment.

(Exhibit 11 at 269–72; Jacobs at 198).

99. On January 4, 1978, Jacobs noted a significant careless error made by Womack in preparing code sheets for input into the computer system (Exhibit 11 at 278).

100. On January 11, 1978, Jacobs discussed Womack's performance and continued employment with Financial Representative Brown. Prior to Brown's departure from the Mobile Plant in 1975, Brown was Womack's immediate supervisor. Jacobs advised Brown that Womack's performance during his two-month probationary period was neither satisfactory nor competitive within his peer group. Jacobs further advised Brown that since Brown's return, Jacobs had observed a "dramatic" change in Womack's work attitude. For example, Brown assigned Womack a number of tasks to handle during the one-week period when Brown returned to Houston to move his family to Mobile. Womack expended extra hours after normal quitting time to complete the assigned tasks in Brown's absence. Womack's extra effort was atypical of his prior performance and Jacobs suggested that a direct supervisory change might improve Womack's motivation and performance. Accordingly, Jacobs requested that Brown undertake direct supervision of Womack during an extended ten-week probationary period. If Womack demonstrated an improved attitude, continued work improvement, and a conscientious effort toward further improvement, his employment would be continued on a longer term basis. Brown accepted the opportunity:

> We hope this approach will finally be the key to finding a proper performance level for Mr. Womack. So far, in the last year to 18 months, we have been unable to tap that motivation point even though we have tried various approaches. Hopefully with a change in supervisory personnel we may be able to find the key and obtain the performance level necessary to continue Mr. Womack's employment.

(Exhibit 11 at 288–289; Brown Affidavit ¶¶ 16–22).

101. On January 30, 1978, Brown and Jacobs conducted an interim performance discussion with Womack. Upon request, Womack assessed his own performance during the previous three months; Womack believed that he had improved greatly on routine monthly tasks and had improved somewhat on special assignments. Jacobs concurred that performance of routine monthly tasks and Womack's motivation level had improved but noted that Womack still had difficulty with timely completion of special assignments. Jacobs outlined specific areas where Womack needed additional improvement and advised Womack that his probation would be extended 60 days, after which time a decision would be made whether his progress sufficiently established that Womack was a viable employee. Following the discussion, Jacobs noted that Womack appeared much more comfortable in his relationship with Brown than he had been with either Jacobs or Stark (Jacobs at 202–04; Exhibit 11 at 290–291; Brown Affidavit ¶¶ 23–26).

102. On April 28, 1978, Jacobs and Brown discussed Womack's performance during his ten-week probationary period. Both concluded that Womack demonstrated marked improvement, primarily in the area of motivation, and that the improved attitude had carried over into all work assignments. At the conclusion of the discussion, Jacobs and Brown concluded that Womack's summary rating code would be adjusted from a "5" (unacceptable) to a "4" in recognition of his performance improvement during the probationary period (Exhibit 11 at 295–296; Brown Affidavit ¶¶ 27–28).

103. On May 1, 1978, Womack received a general salary increase and on the following day Brown appraised Womack's performance during the probationary period. Brown noted that Womack had successfully established a ten-week projection on special projects that focused upon task accomplishment (Brown Affidavit ¶ 26; Exhibit 8) and that Womack had demonstrated a "desire" and "willingness" to participate in extra work:

In summary, [Womack] has done a good job in the ten (10) week period, exhibiting a good attitude, willingness and knowledge. He has had illness problems, but he is under doctors' care to correct the situation. [Womack] is contributing to the team effort. [Womack] has good experience in the entire accounting section, and in maintaining his present attitude, he will continue as an asset in the department.

The recommendation is to so advise [Womack] and provide our support for further improvement and salary adjustments.

(Exhibit 11 at 294).

104. On May 4, 1978, Brown prepared Womack's formal job performance Appraisal Report for the period December 1977 through May 1978 (Exhibit 5). The Appraisal Report described Womack's "work assignment" and stated the "results produced" during the ten (10) week probationary period:

Preceding past four months, the job was not done on satisfactory basis. After extensive discussions on the subject and given a 10 week time frame to show evidence of performance, accomplishment and attitude improvement, [Womack] has been doing a satisfactory job.

(Exhibit 5 at 1). The Appraisal Report further stated that Womack's "job knowledge" had been "less than desired" in the past but was showing "strong signs" of improvement. The report also noted that Womack had "exhibited weakness" in connection with his "professional knowledge" but that improvement was indicated (Exhibit 5 at 2). The "Appraisal Summary" portion of the Appraisal Report stated:

*Summarize greatest strengths.*

Determination to hang on and try to persist and not give up when conditions look unfavorable. Pleasant individual to work with and willing to assist and say yes and help out with the task. Willingness to hang on and accomplish long detailed tasks.

*Summarize principle job areas where improvement is needed.*

Develop self-assurance, job knowledge and completed task accomplishment. Look for guidance and understanding and don't attempt to muddle through because of unassurance and lack of understanding. Open communications.

(Exhibit 5 at 3). The "Appraisal Summary" noted that "with continued improvement" Brown would "willingly accept" Womack as an employee (Exhibit 5 at 3).

105. To complete the "Performance Discussion" portion of the Appraisal Report, Brown conducted the performance discussion with Womack. The discussion centered upon Womack's "turn around" from poor performance to satisfactory performance during the previous four months. Brown expressed the need for continued improvement and long-term effort (Exhibit 5 at 3).

106. On May 8, 1978, Jacobs conducted an informal performance discussion with Womack to determine how Womack "perceived" his formal performance discussion with Brown. Womack gave a frank appraisal of his own performance during his years with Shell and admitted that until October 1977 he had been unable to accept unfavorable performance appraisals. Womack attributed his improved attitude to his acceptance of the fact that the previous appraisals were not unfair. Womack further stated that in October 1977, he first realized that no one had an ax to grind and that no one was discriminating against him. Womack informed Jacobs that Brown's assessment of his (Womack's) performance was realistic and that he (Womack) had "a clear understanding of his performance rating," a 4–0–U.[19] Jacobs advised Womack not only that he [Jacobs] had observed positive attitude and performance changes but

---

**19.** The "4–0–U" summary rating code signifies:
4—Performance is generally acceptable relative to normal expectations, but does not fully meet all expectations. . . .

&ast; &ast; &ast; &ast; &ast; &ast;

0—Probably not promotable beyond present level within next five years. . . .

&ast; &ast; &ast; &ast; &ast; &ast;

U—Promotion unlikely within five years.
(Exhibit 15 at 3–4).

also that he was pleased to see Womack putting forth a conscientious effort (Exhibit 11 at 297).

107. On August 16, 1978, Marcel Dastugue transferred to the Mobile Plant and replaced Jacobs as Plant Controller (Dastugue Affidavit ¶ 4). Jacobs transferred to Shell's Head Office in Houston and assumed a staff position (Jacobs at 205).

108. On March 1, 1979, Donna Lowery (Lowery), a white female accountant employed by Shell on July 11, 1977, was promoted from a position as "Accountant Grade 5" to the position of "Financial Accountant Grade 6" (Answer at 13).[20] Mobile Plant Controller Dastugue made the promotion decision. At the time Lowery was promoted, the following individuals held professional positions in the Financial Department at the Mobile Plant:

| | |
|---|---|
| R. G. Brown | — Financial Representative (Supervisor) |
| Joe N. Womack | — Accountant |
| Donna S. Lowery | — Accountant |
| Clair Alijamal | — Financial Accountant |
| J. L. W. Jiminez | — Financial Analyst |

(Dastugue Affidavit ¶ 6). Dastugue's promotion of Lowery effective March 1, 1979, was based upon Lowery's job performance Appraisal Report, his personal observation of Lowery's performance and the concurrence of Financial Representative Brown who had frequent contact with Lowery (Dastugue Affidavit ¶ 7; Brown Affidavit ¶¶ 30–31).[21]

109. In May 1979, Brown prepared a formal "Performance Assessment Report" (formerly labeled "Appraisal Reports," Exhibit 6) regarding Womack's performance during the previous year. The "Work As-signment" portion of the report reflected increasing professional content:

Maintain control of our Capital/Plant Change Expenditures and budget position as directed by Policy and Procedure. Utilize the Capital Work Order System (CWOS) as a tool for the accounting activity. Generate local and Head Office reports on Capital. Closing participation includes preparation Stores entries, Capital and Depreciation, Raw and Processed Materials Control and coordination assistance. Participates in the auditing program, controls our property taxes and participates on special projects.

(Exhibit 6 at 1). Under "Results Accomplished," Brown noted that "with work volumes doubled, [Womack] maintained his forward progress and adequately handled his areas of responsibility." The report further provided:

### PERFORMANCE FACTORS

#### JOB KNOWLEDGE

Good depth in Capital Accounting knowledge (policy adequate; mechanics good) and has broad knowledge of our entire computerized accounting system (lacks PCIS mechanics). Needs to express policy to others.

#### PROBLEM SOLVING

Adequate. Normally takes time to consider before reaching conclusion. However, needs further in-depth review at times to insure correct answer.

\* \* \* \* \* \*

#### RESPONSE TO JOB DEMANDS

Adequate. Should ask more questions and provide more detailed answers. Must become an innovator and be able to

---

**20.** Lowery's summary rating code at the time of her promotion was *above* a "3," or within the top 35% of rated employees in her position company-wide (McGrath Affidavit ¶ 24; Exhibit 15 at 3). Shell maintains the confidentiality of salaries, performance appraisals and summary ratings of employees. Pursuant to the request of Womack and a protective order of the court Shell deposited the Employee Service Record and a July 1978 Appraisal Report (Performance Appraisal) of Lowery with the clerk of the court.

**21.** Lowery was not "promoted over" Womack as alleged in the complaint. The promotion to Financial Accountant represented a promotion from "Grade 5" (an entry level grade) to "Grade 6" based upon Lowery's performance. Lowery's promotion did not foreclose a similar grade promotion for Womack if his performance justified the promotion (Brown Affidavit ¶ 31; McGrath Affidavit ¶ 22).

determine what Technical users need to manage their business in Capital area.

\* \* \* \* \* \*

*SOCIAL—BUSINESS OBJECTIVES*

Rates well. [Womack's] loyalty to the company is great and he speaks always in support. Has guided many Blacks into our organization. Employee relations has made recognition of this.

The "Performance Summary" portion of the Report identifying "Employee Strengths" reflected improvement in Womack's performance and concluded:

As a special note on [Womack]. His performance in the past 12 months has put him back into the main stream of our organization. His confidence is returning; he is making a contribution and is expected to continue with his improving image.

The report did, however, note areas in which "Performance Improvements" were necessary:

More effectively put [Womack's] knowledge on Capital to work. Improved policy understanding and presentation. Be more involved in AFE [Authority For Expenditure] preparation by asking more questions about the details; be prepared to support reasoning on AFE's. In other areas, don't assume other person is responsible; make sure items identified for action are resolved by someone. Be aggressive and make sure completed staff work reflects in-depth analysis and well thought out conclusions. Express thoughts more frequently and push for satisfactory answers. Develop a "self-starter" image. Improvement to build self-confidence.

(Exhibit 6 at 1–3).

110. On May 21, 1979, Brown conducted a "Performance Discussion" with Womack as part of the performance appraisal program. Following the performance discussion Brown noted:

[Womack] read the evaluation, indicating there were no surprises. The talk centered around improvement areas, promotion and salary, along with job recogni-

tion. Full support for [Womack's] continued progress and ways for continued improvement were discussed. *Salary and promotion were directly linked to improved performance over a long time frame.* Action plans are for completed staff work tied to Capital responsibilities and for continued opportunities to gain job recognition and increasing responsibilities.

(Exhibit 6 at 3) (emphasis supplied). Although Lowery was promoted to "Financial Accountant" in March 1979, Womack made no mention of the promotion during the performance discussion with Brown. A month later (June 19, 1979), Mobile Plant Controller Dastugue reviewed and executed the Performance Assessment Report and noted "Womack is satisfied and work performance has improved. [Womack] should use this base to improve performance further as stated above." (Exhibit 6 at 3)

111. On June 14, 1979, Womack wrote a letter to the Equal Employment Opportunity Commission (EEOC) and attached an outline of charges of discrimination against Shell. In pertinent part the outline provided:

*CHARGE*: Shell Chemical Company—Mobile Plant discriminates against black professional workers in its promotional practices.

\* \* \* \* \* \*

*CHARGE*: During the years 1975 through 1978 Shell Chemical Company—Mobile Plant discriminated against Joe N. Womack, Jr. in its pay and promotional practices.

\* \* \* \* \* \*

Although [Womack] has worked at the [Mobile] Plant for nearly six years, the Mobile Plant has hired and promoted a white female accountant within her first year and a half employment with Shell. This individual has less experience and far less knowledge of the accounting policies and procedures at the [Mobile] Plant than Womack has.

(Womack Affidavit In Opposition To Motion To Dismiss; Exhibits attached to

Womack's Brief In Opposition To Motion To Dismiss). Shell did not receive notice of Womack's charge of discrimination until December 31, 1979, when Shell received Womack's EEOC Charge of Discrimination dated December 19, 1979 (McGrath Affidavit ¶ 7; Exhibit 47).

112. On July 1, 1979, Womack received a general salary increase and in August 1979, Womack was sent to a basic management skills training course in Houston. On October 1, 1979, Womack received a special pay increase (McGrath Affidavit ¶ 19, ¶ 17).

113. In early December 1979, (at least three weeks *before* Shell received notice of Womack's EEOC charge) Dastugue reviewed Womack's summary rating code for the year. Dastugue noted that although Womack was ranked a borderline 3 or 4, he was being proposed to Head Office as a 3-rated performer in the value order listing completed in December 1979. Womack had demonstrated steady progress in the mechanical aspects of his job performance but still needed improvement in judgmental ability. Dastugue further noted that he would probably recommend that Womack be promoted to Financial Accountant Grade 6 in July 1980 (Exhibit 48). Thus, Plant Controller Dastugue tentatively concluded that he would recommend Womack for promotion *before* Shell received notice of Womack's EEOC charge. The record reflects that Shell had no knowledge of Womack's charge prior to receipt of notice from the EEOC on December 31, 1979 (McGrath Affidavit ¶ 7).

114. Womack maintained a close rapport with Brown who Womack described as a "very likable guy, very knowledgeable in all aspects of the job, a very good teacher." Womack testified that Brown's supervision created "a perfect atmosphere on the job to work within." (Womack at 51) Womack's improved motivation and performance were closely related to Brown's tenure as Financial Representative at the Mobile Plant. In August 1979, Brown was replaced as Financial Supervisor at the Mobile Plant by A. M. Greco. Greco also assumed direct supervisory authority over Womack (Brown Affidavit ¶ 31).

115. On December 14, 1979, Greco and Plant Controller Dastugue conducted an informal performance discussion with Womack. The discussion centered upon "current performance," "promotability," and "staff planning." Greco recognized Womack's recent improvement but noted that he previously had several years sub-standard performance. Although Womack's Capital accounting work was generally acceptable, more initiative and in-depth analysis were necessary. Womack's work on unstructured work and specially assigned tasks was particularly deficient; for example, Womack was significantly delinquent in completing his assigned work on the Capital/Work Order Manual. Greco and Dastugue advised Womack that his role with Shell would probably be limited to a specialist at the Mobile Plant, which meant that promotions requiring transfer to Head Office would probably be foreclosed. Greco and Dastugue added that if Womack continued to show improvement he might eventually reach "Grade 7," assuming Womack had the ability to compete effectively and that such jobs were available in the Mobile Plant. Finally, Greco and Dastugue discussed the possibility that Womack would be promoted to "Grade 6" in his present assignment. Womack candidly admitted he had little interest in relocation or job rotation within the Mobile Plant to learn new tasks:

> Joe added that, while he would consider a new assignment, he was still satisfied in his present position, that he "still had a lot to learn," that he "was not bored in his present assignment," and that he was "learning something new every day."

(Exhibit 23). Womack further recognized that in the area of job rotation, certain assignments in the Mobile Plant are "training desks" and assignment to such desks should be reserved for professionals who would eventually be transferred (Exhibit 23).

116. On December 31, 1979, Shell received a Notice of Charge of Discrimination from the EEOC together with a copy of

Womack's EEOC Charge of Discrimination dated December 19, 1979. The management of the Mobile Plant *first* learned that Womack had filed an EEOC charge against Shell at that time (Exhibit 47; McGrath Affidavit ¶ 7).

117. On January 4, 1980, Womack filed a protest in connection with inspection of his personnel file. Womack noted that he had previously been permitted to review his personnel file in private but that after a recent request he had been instructed by Employee Relations Manager McGrath that someone else should be present while he reviewed the file (Exhibit 49).

118. In February 1980, Mobile Plant Controller Dastugue made the decision, with the approval of the Mobile Plant Manager, that Womack be promoted to "Financial Accountant Grade 6" effective March 1, 1980, with a salary increase commensurate with the promotion (McGrath Affidavit ¶ 20). When told of the promotion on February 22, 1980, Greco noted:

> [Womack's] response was whether he will get the "same opportunity as Donna Lowery did when she was promoted to go to PCIS training course." [Dastugue] stated that: (a) there is no formal training course for PCIS (this was an information type session); (b) [Lowery's] attendance had nothing to do with [her] promotion; and (c) the PCIS involvement did not have a direct impact on [Womack's assigned] desk.

(Exhibit 25; McGrath Affidavit ¶ 20).

119. Shortly after the effective date of his promotion, Womack wrote Employee Relations Manager McGrath and again requested that he be afforded the same training that Lowery had received when she was promoted. Womack wrote that Lowery had been sent to Houston (Shell's Head Office) for one week's training on Shell's Product Cost Information System (PCIS). Womack inquired whether he would receive the same opportunity (Exhibit 18). Employee Relations Manager McGrath responded in pertinent part as follows:

*PCIS TRAINING*—No specific PCIS training program exists. From time-to-time, the systems group responsible for operation and maintenance of PCIS has provided an unstructured review of the system, its objectives and methodology. This has not been offered on any specific schedule. Accordingly there is no PCIS training course as such.

Your present assignment on the Degussa Accounting Activity has almost no direct involvement with the Product Cost Information System. Availability of this training, has no impact on your ability to succeed in your new assignment. Training such as PCIS training is opportunity training which provides familiarization and background. It is not necessary for success in a job, even in the assignment directly responsible for product costing. For instance, the individual who handled [Product Costing] over the past year has never had a PCIS review in Houston. There was no follow-up conversation [regarding Womack's initial request for PCIS] because your supervisors who were present were all of the belief that the conversation had covered their conclusions about the following subjects:

—There was no scheduled PCIS training course

—Ms. Lowery's attendance had nothing to do with her promotion or her assignment in the Degussa accounting desk.

—The Degussa accounting desk [Womack's] job assignment has almost no involvement with PCIS.

—PCIS training would not help you succeed on the Degussa desk as it is presently structured.

At this same discussion on February 22, you requested to visit Degussa to meet the people with whom you would be working. This request was job related and was quickly honored.

Since we are always looking for ways to broaden the knowledge of our employees, we will continue to take advantage of opportunity training. If an opportunity to receive PCIS training should arise, it

would be up to your supervisor to decide who, if anyone, should be nominated.[22] I am firmly convinced that you have been given and will continue to be given the same opportunity to succeed in your new position. Your background lacks no training that would interfere with successful performance of your new job. You have attended the Auditor, Presentations, Basic Management Skills and Capital Expenditure Forecast Workshops. We have noted your request to attend the Communications Workshop and will schedule that course as openings permit.

(Exhibit 19; McGrath at 40–43).

120. On deposition, Womack admitted that PCIS dealt with *cost* accounting and that in the past he had not worked in the cost accounting area. Womack also admitted that his present job assignment on the Degussa desk is unconnected with cost accounting. Womack testified that no accountant outside the cost accounting area at the Mobile Plant had been afforded PCIS training and that only one or two Accountants (Lowery and Alijamal) had in fact received such training. Indeed, Womack admitted that former Plant Controller Jacobs, Plant Controller Dastugue and Financial Representatives Brown and Greco had not received PCIS training; Womack explained, however, that each of those individuals was not in the cost accounting area (nor was Womack) (Womack at 226–233). Although Womack testified that a PCIS Manual would be essential for an accountant assigned to the cost accounting desk at the Mobile Plant, he admitted that he had neither read nor inquired about such a manual in order to personally acquaint himself with PCIS (Womack at 228). The facts demonstrate that Womack's PCIS claim is based *exclusively* on the fact that Lowery received such training after she was promoted and Womack had not received the

training at the time he filed this action. Yet, it is undisputed that Womack received *numerous* other Shell training courses, many of which Lowery has *not* received (McGrath Affidavit ¶ 17).

121. On August 22, 1980, Financial Representative Greco (Womack's immediate supervisor) prepared Womack's Performance Assessment Report (Exhibit 7) for the year.

### JOB PERFORMANCE
*WORK ASSESSMENT*

Throughout most of the review period, Joe was Capital Accountant.... Joe coordinated Mobile Plant's financial reporting responsibilities to Head Office including quarterly Status of Accounts and related due diligence review, year-end Price Waterhouse schedules and various tax reports. He was expected to perform his accounting responsibilities in an efficient, accurate, and timely manner; exercise discretion; and complete projects with minimum supervision. Joe received a new assignment on March 1, 1980 and is presently responsible for Degussa Accounting, assigned projects, and part of the annual STOP preparation.

*RESULTS ACCOMPLISHED*

Throughout the review period, Joe's performance in the Capital area was satisfactory.... However, job improvements were rarely made. Some critical Head Office financial reports for which Joe was responsible contained errors. Some of these errors were caught through supervisory review, while others were detected at Head Office. Most of these errors were of significant dollar magnitude and related to critical, but relatively routine, reports. At Mr. Womack's request, we have identified these errors in attachments 1–5. In addition, two projects which have been assigned for the duration of the review period

22. Lowery's initial "training" on PCIS was an unstructured orientation in 1979. In mid-1980, the orientation on PCIS was restructured as a more formal training session. Lowery attended the PCIS training in late 1980. The structured course on the PCIS system in Houston was again scheduled in March 1981. Financial Representative Greco nominated two individuals to attend the PCIS training—J. R. Petty and Womack. The Mobile Plant subsequently received two authorizations for PCIS training from Head Office and both Petty and Womack commenced PCIS training on March 23, 1981 (McGrath Affidavit ¶ 21).

remain incomplete. One project, a Capital Work Order Procedures Manual, was turned in by Joe around August 1979. It lacked adequate forethought and planning and was returned to Joe for additional action. The other project, a Detail Asset Listing, was turned in last October. This contained numerous errors and was returned for correction and updating. In not completing these projects, Joe failed to meet an objective of the prior review period. While it is too early to evaluate his performance on his new assignment, there has been some positive action on his part which includes putting in long hours to get the job done and a more aggressive approach to his job.

## PERFORMANCE FACTORS

### JOB KNOWLEDGE
Generally acceptable.

### PROBLEM SOLVING
Occasionally has some difficulty in problem-solving. Conclusions tend to lack adequate forethought.

### PLANNING AND ORGANIZATION
Generally meets closing schedule; however, assigned projects were not completed in a timely manner.

### RESPONSE TO JOB DEMANDS
Should react better to job requests and not require frequent reminders. Requires closer supervision than he should with his length of service.

## PERFORMANCE SUMMARY

### EMPLOYEE STRENGTHS
Knowledge of financial closing schedule. Assists support staff in answering questions related to closing cycle. Gets along well with his peers.

### PERFORMANCE IMPROVEMENTS
Joe needs to eliminate careless errors and complete assigned work on a timely basis with minimum supervision. He needs to improve his analytical skills and be more conscious of opportunities to improve procedures, reports and controls. Joe's new assignment leaves him about half his time for project work. We will continue to assign projects that will develop his analytical skills and give him an opportunity to exhibit creativity. We have also assigned him an audit that will broaden his background.

(Exhibit 7 at 1–3).

122. On August 22, 1980, Greco held a performance discussion with Womack. Womack objected to Section B, "Results Accomplished" (Exhibit 7 at 1) and asked that specific examples of errors be documented and attached to his Appraisal Report. Greco agreed to document examples of Womack's errors (Exhibit 7 at 4–8; Exhibit 32).

123. On August 25, 1980, J. E. Fusaiotti, who replaced Dastugue as Controller on February 16, 1980 discussed with Womack his (Womack's) future development plans (Exhibit 30).

124. On September 15, 1980, Greco held two follow-up performance discussions with Womack; Greco documented the performance discussions:

*First Discussion.* The purpose of this discussion was to follow-up on the appraisal. I called Joe in to discuss the two points he objected to in the appraisal and the specific examples he wanted to be put in the appraisal to clarify any points.

As we discussed the changes that Joe requested, he said that he thought I had told only part of the story and that I was intentionally writing misleading statements on the appraisal. I told Joe that if he really believed this, then I was wasting our time. I added that, if he really believed this, he *should* (and I would encourage him to) discuss this with Mr. Robson [Mobile Plant Manager], Mr. McGrath, or [Mobile Plant Controller Mr. Fusaiotti. The meeting was ended at this point and Joe left.

*Second Discussion.* The second discussion was held later in the afternoon. I told Joe that I was concerned about the "misrepresentation of the facts" that he alleged earlier that day. He said that he had been upset earlier that day and *did not mean* those statements. Specifically,

Joe felt that Section B of the appraisal should have read that while he *had made* errors on Head Office reports, certain errors were detected during supervisory review. Other errors were found after the reports were published at Head Office.

I once again *strongly encouraged* Joe, if he felt he was being unfairly treated or if I was misrepresenting facts, that he *should* discuss this *immediately* with Messrs. Robson, McGrath and Fusaiotti. Joe again repeated that he didn't mean what he said.

Again, he requested that documentation showing specifics of errors be included as a part of the appraisal form. I showed Joe some documentation and added that, even though this was not our normal procedure, it would be included as he requested.

(Exhibit 31) (emphasis in original).

125. Four days later, on September 19, 1980, Womack filed this action in the United States District Court for the Southern District of Alabama.

## CONCLUSIONS OF LAW

1. Womack asserts claims under the fourteenth amendment, Title VII, and 42 U.S.C. § 1981. As appears more fully, the court is without jurisdiction over the Title VII claims. The court has jurisdiction over the claim under 42 U.S.C. § 1981 by virtue of 28 U.S.C. § 1343.

2. On December 23, 1980, this court entered an Order that *dismissed* (a) all claims under the fourteenth amendment for failure to state a claim upon which relief can be granted, and (b) the promotion claim under 42 U.S.C. § 1981, as barred by the statute of limitations. The Order did not adjudicate all claims and is, therefore, subject to revision at any time before the entry of a final judgment. *See* Rule 54(b), *Federal Rules of Civil Procedure*. The undisputed facts fully support this court's previous Order. Accordingly, the court makes a final adjudication of such claims herein consistent with the Order previously entered.

3. The court's December 23rd Order retained for adjudication (a) the promotion claim under Title VII and (b) the PCIS training claim under both Title VII and 42 U.S.C. § 1981. The court has not previously addressed Womack's allegation that the rating system utilized by Shell to grade professional accounting staff is "arbitrary and capricious" and "is applied" as "a device" to deny promotion to "some employees."

### Fourteenth Amendment Claims

4. Womack's complaint apparently sought to imply a remedy directly under the fourteenth amendment; such allegations fail to state a claim:

> [T]he federal courts, and this Circuit in particular, have been hesitant to find causes of action arising directly from the Constitution. Our reluctance stems from many concerns, not the least of which is our awareness that the framers of the Constitution saw fit to entrust the job of legislating to Congress.... Congress has provided a means of seeking relief against state officials who violate the Constitution [42 U.S.C. Section 1983].... [O]ur jurisdiction has not been further established.

*Hearth, Inc. v. Dept. of Public Welfare*, 612 F.2d 981, 982 (5th Cir. 1980), *modified*, 617 F.2d 381 (5th Cir. 1980) (*per curiam*).[1] Womack asserted jurisdiction over the four-

---

**1.** Cases in the Fifth Circuit have reached contradictory conclusions on the question whether a private remedy can be implied from the fourteenth amendment. *Compare Dean v. Gladney*, 621 F.2d 1331, 1335–36 (5th Cir. 1980) (the reasoning in *Bivens* should not be understood as "recognizing sweeping federal judicial power to create damage remedies to vindicate constitutional rights.") and *Hearth, Inc. v. Department of Public Welfare*, 612 F.2d 981, 982 (5th Cir. 1980), *modified*, 617 F.2d 381 (5th Cir.

1980) ("[T]he federal courts, and this Circuit in particular, have been hesitant to find causes of action arising from the Constitution.") *with Goss v. San Jacinto Junior College*, 588 F.2d 96, 97–98 n.2 (5th Cir. 1970). ("*On a number of occasions*, we have held that § 1331 confers jurisdiction over actions brought to vindicate First and Fourteenth Amendment Rights.") (emphasis supplied) *and Reeves v. City of Jackson, Mississippi*, 532 F.2d 491, 495 (5th Cir. 1976) (eighth and fourteenth amendment

teenth amendment claims under 28 U.S.C. § 1331. Since a claim based upon an implied remedy under the fourteenth amendment is not insubstantial, the proper procedure is dismissal for failure to state a claim rather than dismissal for lack of subject matter jurisdiction. *See* 13 C. Wright & A. Miller, *Federal Practice and Procedure* § 3562 (Supp.1980).

■ 5. Womack's fourteenth amendment claim is deficient on other grounds as well. It is well established that the fourteenth amendment can only be invoked in instances involving "state action." The fourteenth amendment "erects no shield against merely private conduct." *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *The Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 654 (5th Cir. 1967), *cert. denied*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967). The complaint does not allege that state action was involved in the alleged discrimination against Womack nor does the record support such a finding.

*Promotion—Section 1981*

■ 6. Womack's Section 1981 claim that Shell Accountant Donna Lowery was promoted over Womack in March 1979, is time-barred. In Alabama, a claim under Section 1981 must be brought within one year after the date on which the claim accrued. *Code of Ala.* 1975, § 6–2–39(5); *see Dumas v. Town of Mount Vernon*, 612 F.2d 974 (5th Cir. 1980); 42 U.S.C. § 1988. Womack did not file his Section 1981 claim until September 19, 1980, more than one year after the alleged discriminatory promotion occurred. Womack's Section 1981 claim is, therefore, barred.

*Promotion—Title VII*

■ 7. Title 42 U.S.C. § 2000e–5(e), required that Womack file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice occurred. The policy behind the 180-day limitation period is well-recognized. "The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are long past. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 463–464, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295

claims are "of the kind cognizable by federal courts" regardless of "any enabling statutes such as § 1983"), *after remand*, 608 F.2d 644 (5th Cir. 1979) *and McCulloch v. Glasglow*, 620 F.2d 47 (5th Cir. 1980) (comparing claim against federal official in *Davis v. Passman* with a claim against a town.) The Fifth Circuit *en banc* has not addressed the issue in an enlightening manner. *E. g., Rodriguez v. Ritchey*, 556 F.2d 1185, 1192 (5th Cir. 1977) (*en banc*) (declining to speak on the appropriateness of extending *Bivens*); *accord, Davis v. Passman*, 571 F.2d 793, 796 (5th Cir. 1978) (*en banc*) (facing the *Bivens* issue whether, and under what conditions, a cause of action should be implied from the Constitution), *rev'd*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (criticizing the analytical approach employed by *en banc* while reversing). Thus, the lack of an unequivocal position in this Circuit taken together with the absence of any analytical framework, leave litigants and district courts in a quandary over whether the fourteenth amendment affords a basis for relief under § 1331(a).

Analytically, the sounder approach would be *not* to imply a cause of action under the four-

teenth amendment. In Section 1983, Congress has provided, a remedy to plaintiffs who are wronged by "persons" acting "under color of state law" where the plaintiff has a right, privilege, or immunity secured by the Constitution or federal laws which is infringed. Thus Section 1983 is coextensive in scope with the fourteenth amendment. By contrast, no specific legislation provides aggrieved plaintiffs with a remedy when protections of the Bill of Rights are infringed by federal officers as opposed to "persons acting under color of state law." In order to avoid the predicament of extending a right where no remedy exists under, for example the fourth amendment, *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the fifth amendment, *Davis v. Passman* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Williams v. Wood*, 612 F.2d 982 (5th Cir. 1980) (fifth amendment claim against deputy clerk of federal courts), and the eighth amendment, *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (U.S.1980) (Number 78–1261), a cause of action *must* be implied against federal officials.

(1975); *see United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)." *Delaware State College v. Ricks*, —— U.S. ——, ——, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980).

■ 8. Womack's complaint alleged that Womack "was not promoted [in March 1979] by [Shell] because he is black and for no other reason." This court previously held that Womack filed an EEOC charge *effective* in June 1979 and that the charge, therefore, timely complained of Womack's failure to achieve promotion in March 1979. It is axiomatic, however, that Womack may not rely upon the mere allegations of the complaint when confronted with a properly supported motion for summary judgment. *See* Rule 56(e), *Federal Rules of Civil Procedure.* Womack now admits that the 1979 promotion decision was based solely upon his recorded job performance and that his race was not a factor in the decision. Rather, Womack contends that his former supervisor (former Financial Representative and Mobile Plant Controller Jacobs) was unable to communicate effectively with Womack because Womack is black, and that the communication gap resulted in a poor performance appraisal in March 1977 (supplemented August 1, 1977).[2] While Jacobs admittedly had no direct input into the 1979 promotion decision, Womack contends that Plant Controller Dastugue based the promotion decision, in part, on the poor 1977 performance appraisal. Womack admits that he reviewed and discussed the March 1977 appraisal with Jacobs and that he was afforded the opportunity to contest the appraisal at that time. Indeed, Womack did review the appraisal with Employee Relations Manager McGrath. Prior to the date Shell received notice of his EEOC charge, however, Womack admitted that he never advised anyone at Shell that his race was

allegedly a factor in the 1977 appraisal. No facts support a finding that Dastugue either knew or should have known that Womack considered the 1977 appraisal racially biased. The record conclusively establishes that in 1977 Womack had knowledge of all the relevant facts.

■ 9. For the purpose of the time limitations under 42 U.S.C. § 2000e–5(e), the proper focus is upon the date of the alleged *discriminatory act*, "not upon the time that the consequences of that act became most painful." *Delaware State College v. Ricks*, —— U.S. ——, ——, 101 S.Ct. 498, 505, 66 L.Ed.2d 431 (1980), *citing Abramson v. University of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979). The record conclusively establishes that the alleged discriminatory act occurred in 1977 and that Womack's EEOC charge was not filed until June 1979.

10. Womack cannot successfully contend that the denial of promotion was a "continuing violation;" i. e., the "present effect" of the alleged "past discrimination." In *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the Supreme Court held that a Title VII defendant "was entitled to treat [a] past act as lawful after [plaintiff] failed to file a [timely] charge of discrimination." The Supreme Court stated:

A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed.... [S]eparately considered, it is merely an unfortunate event in history which has no present legal consequences.

431 U.S. at 558, 97 S.Ct. at 1889. The *Evans* decision casts serious doubts upon the vitality of the "present effect" theory of a continuing violation:

**2.** On deposition, Womack proffered *no* factual support (other than his personal belief) for the assertion that the communication gap was racially motivated. In response to summary judgment, Womack admitted that his .case "centers around" Jacobs (Womack Response at 2) and expressed his *belief* that Jacobs' actions were racially motivated (Womack Affidavit ¶ 16). Womack's subjective conclusion regard-

ing the reason for Jacobs' appraisals is insufficient to raise a genuine issue of material fact. *See Gatling v. Atlantic Richfield Co.*, 577 F.2d 185, 188 (2d Cir. 1978). The conclusory statements in Womack's affidavit, filed May 11, 1981, do nothing to raise a genuine dispute over any material fact. This case presents a fully developed record which leaves no material fact in dispute.

The "present effects of past discrimination" theory suffered a severe, if not mortal, blow in *Evans.* The majority opinion, by focusing on whether a current violation exists, appears to foreclose claims based solely upon the residual effects of discriminatory conduct not made the subject of a timely charge.

B. Schlei and P. Grossman, *Employment Discrimination Law* at 234 (BNA 1979 Supp.). *See Wood v. Southwestern Bell Tel. Co.,* 442 F.Supp. 41 (E.D.Mo.1977), *rev'd on other grounds,* 580 F.2d 339 (8th Cir. 1978) (failure to promote based upon past denial of training held no present violation).

11. The Supreme Court significantly elaborated on *United Airlines v. Evans* in *Delaware State College v. Ricks,* —— U.S. ——, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), in which the Supreme Court reaffirmed that a "continuing violation" theory is applicable "only if a present violation exists." *See Milton v. Brown,* 25 F.E.P. 134, 138 n.13 (D.C.Cir.1981). In *Ricks,* a college professor filed a Title VII action challenging a termination that was the consequence of a denial of tenure which occurred approximately one year earlier. Ricks did not file a timely EEOC charge after the denial of tenure. The Supreme Court first "identif[ied] precisely the 'unlawful employment practice' of which [Ricks] complain[ed]," and noted that Ricks claimed that the denial of tenure and his subsequent termination constituted a "continuing violation." The Court rejected that contention:

> Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination. [Citation omitted] If Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment. But the complaint alleges no such facts.
>
>     \*    \*    \*    \*    \*    \*
>
> [T]he only alleged discrimination occurred—and the filing limitation period therefore commenced—at the time the tenure decision was made and communicated to Ricks. That is so even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later. The Court of Appeals for the Ninth Circuit correctly held in a similar tenure case, that "[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful." *Abramson v. University of Hawaii,* 594 F.2d 202, 209 (1979) (emphasis added); *see United Air Lines v. Evans, supra,* at 558, 97 S.Ct. at 1889. It is simply insufficient for Ricks to allege that his termination "gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination." *Id.* at 557, 97 S.Ct. at 1888. The emphasis is not upon the effects of earlier employment decisions; rather it "is whether any present *violation* exists." *Id.* at 558, 97 S.Ct. at 1889 (emphasis in original).

101 S.Ct. at 504. The Supreme Court concluded that Ricks' EEOC charge was untimely and that the court lacked jurisdiction over the Title VII claim.

12. Womack did not file a timely charge with the EEOC regarding the only alleged discriminatory act; i. e., the unfavorable performance appraisal in 1977. This court, therefore, dismisses the claim because it lacks merit since Womack filed to meet the "pre-condition to filing [a Title VII] suit in district court. . . ." *Coke v. General Adjustment Bureau,* 640 F.2d 584, 595 (5th Cir. 1981) (*en banc*) (arising under *Age Discrimination in Employment Act of 1967; reversing, McArthur v. Southern Airways, Inc.*); *see Oaxaca v. Roscoe,* 641 F.2d 386 (5th Cir. 1981) (applying *Coke* to Title VII).

13. Womack's Title VII promotion claim is deficient, on substantive grounds, as well, because Womack has not established a *prima facie* case of racial discrimination in connection with his failure to achieve promotion. Womack's promotion claim is based upon disparate or discriminatory treatment. In *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court stated:

"Disparate treatment" is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *Proof of discriminatory motive is critical,* although it can sometimes be inferred from the mere fact of difference in treatment.

431 U.S. at 335 n.15, 97 S.Ct. at 1854 n.15 (emphasis supplied). In *Personnel Adm. of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the Supreme Court defined "discriminatory purpose" in a case under the fourteenth amendment:

> "Discriminatory purpose," ... implies more than intent as volition or intent as awareness of consequences. [citation omitted] It implies that the decision-maker ... selected ... a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

442 U.S. at 279, 99 S.Ct. at 2296. Womack bears the ultimate burden of persuading this court that Shell intentionally discriminated against him because of his race. *See Texas Dept. of Community Affairs v. Burdine,* —— U.S. ——, ——, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Board of Trustees of Keene St. Col. v. Sweeney,* 439 U.S. 24, 25 n.2, 99 S.Ct. 295, 297 n.2, 58 L.Ed.2d 216 (1978).

■ 14. Discriminatory intent may be shown by either direct or circumstantial evidence that a specific employment action was racially motivated. *See, e. g., Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). This court fully recognizes, however, the difficulty in adducing evidence of discriminatory intent and has viewed the record in a light most favorable to the plaintiff in accord with the admonition of the Supreme Court in *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977):

> [D]etermining whether invidious discriminatory [racial] purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.

429 U.S. at 266, 97 S.Ct. at 564. The record in this case is utterly devoid of evidence that Womack's failure to achieve promotion in 1979 was racially motivated. On the contrary, Womack admits that the Plant Controller's 1979 promotion decision was based upon Womack's record of performance.

■ 15. Womack tacitly admits that Dastugue had no knowledge that the 1977 performance appraisal was purportedly unfair or racially biased. Even if Womack's job performance appraisals were erroneous, Dastugue's reliance upon the appraisals in making his promotion decision did not involve racial discrimination. The Fifth Circuit has repeatedly held that if an employer mistakenly relies on erroneous information in a decision relative to an employee's promotion or termination, such mistaken belief does not provide the basis for a racial discrimination action under Title VII. *See Jefferies v. Harris Cty. Community Action Association,* 615 F.2d 1025, 1036 (5th Cir. 1980); *Corley v. Jackson Police Dept.,* 566 F.2d 994, 1003 (5th Cir. 1978); *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251 (5th Cir. 1977).

16. Absent direct or circumstantial evidence of discriminatory motive, Womack may raise an "inference of discrimination" by proving a *prima facie* case of discrimination by a preponderance of the evidence as outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The Supreme Court recently clarified the operation of the *McDonnell Douglas* requirements in *Texas Dept. of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981):

> In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the

plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.,* at 802, 93 S.Ct. at 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.,* at 804, 93 S.Ct. at 1825.

\* \* \* \* \* \*

The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. [Citation omitted]

\* \* \* \* \* \*

The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that [he] applied for an available position, for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.

\* \* \* \* \* \*

As the Court explained in *Furnco Construction Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.

\* \* \* \* \* \*

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. [Citation omitted] It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant.

101 S.Ct. at 1093–1095.

17. Although Womack admits that the promotion decision in 1979 was based upon his performance record, the court has applied the "burdens and order of presentation of proof" set forth in *Burdine* and concludes that Womack has failed to raise an inference that the promotion decision was based upon "unlawful considerations" or "impermissible factors." The complained of promotion (from Accountant Grade 5 to Financial Accountant Grade 6 in 1979) was not a promotion for which Womack was required to make affirmative application and it is undisputed that a Grade 6 Financial Account position was available to Womack *if* Womack were qualified.[3] Womack failed to adduce facts to demonstrate that he was qualified for promotion in 1979, and thus failed to establish a prima facie case of discrimination. In this case, Womack's burden of establishing a prima facie case "merges" with his ultimate burden of persuading the court he has been the victim of intentional discrimination in that Shell has proffered Womack's poor performance as a legitimate nondiscriminatory reason for his failure to achieve promotion. Although the Supreme Court in *Burdine* described the "merger" of the plaintiff's burden *after* the plaintiff had established a prima facie case by a preponderance of the evidence *and* after the defendant had articulated legitimate, nondiscriminatory reasons, the

---

**3.** Although Womack initially alleged that Lowery was promoted *over* him in 1979, the undisputed facts establish that *both* Lowery and Womack could have been promoted to Grade 6 Financial Accountant *if* the job performance of *each* had so warranted. Womack does not dispute that Lowery was qualified for the promotion (Womack at 168–169).

Court's analysis is equally applicable here, where the employer's proffered reason coincides with an element of the plaintiff's prima facie case; i. e., that Womack was not qualified for promotion because of his poor performance record:

> The plaintiff retains the burden of persuasion. [He] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. *This burden now merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination.* [He] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

101 S.Ct. at 1095 (emphasis supplied). Womack testified he was "qualified" for the promotion (Womack at 138). The court need not decide whether such testimony is sufficient to establish a *prima facie* case in light of undisputed objective evidence of Womack's poor performance. Shell has adduced admissible evidence articulating the legitimate, nondiscriminatory reason for Womack's failure to achieve promotion in 1979.[4] Womack has utterly failed to adduce facts that demonstrate the proffered reason is a pretext. Whether the court concludes that Womack has failed to prove a prima facie case or that Womack has failed to prove that Shell's proffered reason was not the true reason, the result is the same—Womack has failed to adduce any facts to establish that he has been "the victim of intentional discrimination."

*Product Cost Information System*

Womack claims that he was denied training on Shell's Product Cost Information System in February 1980 because he is black. Womack's claim is based exclusively upon the allegation that:

**4.** Shell proffered as deposition and affidavit exhibits extensive documentation regarding Womack's performance, including portions of Womack's work product. The records were timely prepared by, or from information transmitted by, persons with knowledge of the facts

> [Womack] was [at the time of his promotion to Financial Accountant Grade 6 in February 1980] denied the training on Shell's Product Cost Information System (PCIS) that had been given to his white predecessor.

(Complaint ¶ 18). Womack utilizes Title VII and 42 U.S.C. Section 1981 as parallel bases of relief in connection with the PCIS claim.

■■■■ 18. Womack did not file an EEOC charge complaining of his delay in receiving PCIS training. The court previously held that Womack's allegation regarding PCIS training was "reasonably related" to his EEOC promotion charge and that the court would, therefore, "entertain" the PCIS claim as well. *See Ray v. Freeman,* 626 F.2d 439, 443 (5th Cir. 1980), *citing Danner v. Phillips Petroleum Co.,* 447 F.2d 159 (5th Cir. 1971). The "reasonable relation" exception to Title VII's filing requirement, however, is premised on the existence of a *timely* filed EEOC charge to which the conduct can be reasonably related. *See, e. g., Ray v. Freeman,* 626 F.2d 439, 442 (5th Cir. 1980). Since Womack's June 1979 EEOC charge was not timely filed (*see* Conclusions of Law ¶¶ 712), the PCIS allegations cannot *reasonably relate* to an untimely charge. This court is, therefore, without jurisdiction over the claim under Title VII, 42 U.S.C. § 2000e–5(e).

■■■■ 19. The court also concludes that Womack's PCIS claim under both Title VII and 42 U.S.C. § 1981 is deficient on substantive grounds, as well. The court previously addressed the required showing of racially discriminatory intent in a disparate treatment case under Title VII. That discussion is equally applicable to Womack's Title VII claim in connection with training on PCIS. The PCIS claim, however, is also based on Section 1981. This court has held

and were kept in the regular course of business pursuant to Shell's regular business practice. Womack does not dispute that the exhibits are admissible under Rule 803(6), *Federal Rules of Evidence.*

that the Supreme Court's decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), requires a showing of discriminatory intent in order to support a claim under 42 U.S.C. § 1981. *See Patel v. Holley House Motels*, 483 F.Supp. 374, 383 (S.D.Ala.1979). The Fifth Circuit has likewise held that a plaintiff must demonstrate "purposeful discrimination" to support a claim under Section 1981. *Thompson v. Leland Police Dept.*, 633 F.2d 1111, 1112 (5th Cir. 1980) (citing *Williams v. DeKalb County*, 577 F.2d 248, *on rehearing*, 582 F.2d 2 (5th Cir. 1978)); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("There is no question that under section 1981, the plaintiff must establish purposeful discrimination equivalent to that required by those alleging fourteenth amendment dereliction."); *Crawford v. Western Electric Company, Inc.*, 614 F.2d 1300, 1309 (5th Cir. 1980); ("[A]n action under 42 U.S.C. § 1981 requires a showing of discriminatory intent."); *Scott v. City of Anniston*, 597 F.2d 897, 899 (5th Cir. 1979); (*"Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) held that to prevail under Section 1981 a plaintiff must prove discriminatory purpose.") (footnote omitted); *Grigsby v. North Miss. Med. Center, Inc.*, 586 F.2d 457 (5th Cir. 1978); *William v. DeKalb County*, 577 F.2d 248 (5th Cir. 1978), *modified*, 582 F.2d 2 (5th Cir. 1978).

20. As under Title VII, Womack may prove intentional discrimination under § 1981 by adducing direct or circumstantial evidence of discriminatory intent. The record in this case, however, is devoid of such evidence of discriminatory motive in connection with the training on PCIS. Womack admits that his former and present supervisors (Brown, Greco, Jacobs and Dastugue) have *not* had PCIS training (Womack at 232–33), and that other (non-black) Accountants at the Mobile Plant (R. Petty and J. Jiminez) have also not received the training (Womack at 233). In fact, no Accountant outside the cost accounting area at the Mobile Plant (Womack does not and has not performed cost accounting) has received such training.

21. Absent direct or circumstantial evidence of racial discrimination, Womack may raise an inference of discrimination by establishing a *prima facie* case. The elements of a *prima facie* case of race-based disparate treatment enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), are the same, whether the action is maintained under 42 U.S.C. § 1981 or Title VII. *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("When Section 1981 is used as a parallel basis of relief with § 706 of Title VII against disparate treatment in employment, its elements appear identical to those of § 706."); *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980) ("We think the articulation in *Green* of the elements of a prima facie case is equally applicable in cases under Section 1981."); *Ramirez v. Sloss*, 615 F.2d 163, 168, 169 (5th Cir. 1980); *Davis v. Jackson County Port Authority*, 611 F.2d 577 (5th Cir. 1980); *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251 (5th Cir. 1977); *Sabol v. Snyder*, 524 F.2d 1009 (10th Cir. 1975).[5] The court's previous discussion of the *Burdine* decision with regard to the elements and operation of *prima facie* case is therefore equally applicable to Womack's PCIS claim under Section 1981.

22. Even if Womack's testimony that upon promotion to Grade 6 Financial Accountant he did not receive the training that was afforded Lowery is sufficient to establish a *prima facie* case, Shell has adduced evidence of legitimate, nondiscriminatory reasons to explain why Womack was not afforded training on PCIS sooner than he was. The Supreme Court in *Burdine* made clear that once a plaintiff has established a *prima facie* case, an employer does not bear the burden of proving a legitimate

---

**5.** The cited Fifth Circuit cases were decided before the Supreme Court decision in *Texas Dept. of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Although *Burdine* reversed the Fifth Circuit standard regarding the employer's burden once a plaintiff has established a *prima facie* case, the *Burdine* opinion did not disturb the rationale for which the above cases are cited.

nondiscriminatory reason by a preponderance of the evidence:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons.

101 S.Ct. at 1095.

> We have stated consistently that the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which will allow the trier of fact rationally to conclude that the employment decision has not been motivated by discriminatory animus.

101 S.Ct. at 1096.

23. Although Lowery was afforded informal training on PCIS shortly after her promotion and at the time she was responsible for the "Degussa Desk," (the job assignment Womack presently performs), Shell explained that PCIS training is unrelated to either the promotion or the duties of the Degussa Desk; i. e., the fact that Lowery was promoted in March 1979 had nothing to do with her subsequent training on PCIS. Womack admits that training on PCIS is unrelated to both capital accounting and his present assignment on the Degussa Desk. Indeed, Mobile Plant Controllers Jacobs and Dastugue never received such training. Womack's PCIS claim thus rests upon the mere fact that Lowery received the training more quickly than did Womack.[6] Yet, it is undisputed that Womack has been afforded several Shell training courses during his employment that Lowery has *not* received. Shell has articulated legitimate, nondiscriminatory reasons why Womack was not immediately afforded training on PCIS at the time of his promotion to Grade 6 Financial Accountant in February 1980. Womack has offered *no* facts to persuade the court ei-

ther that a discriminatory reason motivated Shell or that Shell's proffered explanation is unworthy of credence. *See Burdine, supra* at 1095.

24. Womack does not contend that his failure to receive training on PCIS prior to March 1981, adversely affected his job performance, compensation, promotion opportunities or any other term or condition of employment. In the absence of facts that Womack's failure to receive training on PCIS in February 1980 (date of his promotion) adversely affected his employment opportunities at Shell, his claim of racial discrimination cannot stand. *Bostick v. Boorstin,* 22 F.E.P. 719–726 (D.C.D.C.1978), aff'd 617 F.2d 871 (D.C.Cir.1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *See also Wright v. National Archives and Records Service,* 609 F.2d 702 (4th Cir. 1979); *McRae v. McCormick,* 458 Supp. 970 (D.C.D.C.1978).

### *Shell Rating System*

25. Womack contends that the rating system utilized by Shell to grade its professional accounting staff is applied as a device to promote some employees and deny promotion to other employees not based on actual job performance. On deposition, Womack frankly admitted that he had no facts to support the claim. Womack would apparently have this court hold that any promotion or rating system that contains subjective factors is *per se* discriminatory. Such a contention is without foundation in either law or fact.

26. In *Wade v. Mississippi Coop. Ext. Service, Inc.,* 528 F.2d 508, 518 (5th Cir. 1976), and *Rowe v. General Motors Corp.,* 457 F.2d 348, 358–59 (5th Cir. 1972), the Fifth Circuit condemned hiring and promotion practices that utilized subjective criteria as a device to discriminate against blacks. The *Wade* and *Rowe* decisions, however, did not establish a blanket rule that subjective criteria in any promotion system are *per se* impermissible. In *Hereford v. Huntsville Bd. of Educ.,* 574 F.2d

---

**6.** Womack did receive training on PCIS in March 1981.

268, 270 (5th Cir. 1978), the Fifth Circuit held that an employer may take into account subjective factors such as applicant's knowledge of the subject, his work philosophy, his appearance, his references, his leadership ability and his aggressiveness. In *Hamilton v. General Motors Corp.,* 606 F.2d 576, 580 (5th Cir. 1979), the Fifth Circuit distinguished *Rowe* again and allowed subjective oral interviews to be incorporated into an employer's employment practices for hiring and promotion, and in *Falkenheiner v. Legal Aid Soc. of Baton Rouge,* 471 F.Supp. 429, 434 (M.D.La.1979), the district court acknowledged that subjective characteristics such as superior ability and leadership qualities were permissible considerations in employer decision-making. Likewise, in *Pouncy v. Prudential,* 499 F.Supp. 427 (S.D.Tex.1980), the district court upheld a rating system based primarily upon three factors—meaningful instructions for evaluators, upper level review of the evaluations and the opportunity for the employee to review the evaluation. Each of the foregoing factors is present in the performance appraisal program in the instant action. The cases simply do not support the proposition that the utilization of subjective factors automatically establishes that the employer's promotion methods are discriminatory.[7] *See generally Lee v. Conecuh County Board of Education,* 634 F.2d 959 (5th Cir. 1981); *Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419 (5th Cir. 1980); *Fisher v. Procter & Gamble Mfg. Co.,* 613 F.2d 527 (5th Cir. 1980).

27. Shell adduced uncontroverted facts, that fully describe the operation and application of the performance appraisal program in this action. No facts support the finding that the system was arbitrarily applied to Womack. Likewise, no facts support the finding that the system was utilized as a device for racial discrimination. Womack's admission that he possesses no facts to support his claim supports a conclu-

sion that the claim is frivolous and that Shell is entitled to a judgment as a matter of law.

Based upon the foregoing Findings of Fact and Conclusions of Law, the court concludes that there is no genuine issue of a material fact and that Shell is entitled to judgment on each of Womack's claims as a matter of law.

Shell's Motion for Summary Judgment is due to be, and the same here is, GRANTED.

---

7. The conclusions of a recent study at Auburn University, which analyzed federal judicial decisions addressing the propriety of particular employer rating systems, support the *Pouncy* court's decision with regard to the type factors that defeat allegations of discriminatory operation of a promotion system. *Feild & Holley, The Relationship of Performance Appraisal System Characteristics to Verdicts in Selected Employment Discrimination Cases* (1980).